L.C.L. THEATRES, INC., a
Texas Corporation

v.

COLUMBIA PICTURES INDUSTRIES,
INC., et al.

Civ. A. No. CA3–7735–G.

United States District Court,
N. D. Texas,
Dallas Division.

June 15, 1976.

Edwin Tobolowsky, Robert C. Cheek, Neal E. Young, Tobolowsky & Schlinger, Dallas, Tex., for plaintiff.

James G. Ulmer, G. Irvin Terrell, Richard A. Brooks, Baker & Botts, Houston, Tex., John L. Hauer, Wm. Michael Byrd, Jr., Frederick, B. Wulff, Akin, Gump, Strauss, Hauer & Feld, Dallas, Tex., for defendants.

## MEMORANDUM OPINION

HIGGINBOTHAM, Judge.

This suit was instituted under the anti-trust laws by L.C.L. Theatres, Inc., a Texas corporation, ("L.C.L." or "The Long Circuit") against ten motion picture distributors (collectively referred to hereafter as "distributors") and their law firm, Sargoy, Stein & Hanft, of New York City, New York, ("Sargoy"). Eleven distributors, including the ten defendants, by counter-claim, seek to recover film rental from L.C.L. and John G. Long alleged to have been due but, through fraud, not paid, for the period January 1, 1966, through November, 1973.

This court has jurisdiction of the claim for violations of the anti-trust laws of the United States by virtue of 15 U.S.C. § 4, also referred to as Section 4 of the Sherman Act. Jurisdiction of the counterclaim is bottomed upon diversity of citizenship (28 U.S.C. § 1332) and upon principles of pendent jurisdiction, the counterclaim being compulsory.

## I.

### The Parties

The Long Circuit owns or leases motion picture theaters in the Texas Cities of Victoria, Bay City, Port Lavaca, Texas City, Freeport, and other smaller towns of the same general geographical area, including Edna, Ganado and West Columbia. Eight theaters are the subject of the distributors' allegations of fraudulent under-reporting:

1. El Rancho of Victoria (burned September, 1975)
2. Showboat of Texas City
3. Velasco of Freeport
4. Texas of Bay City
5. Showboat of Bay City
6. Surf Drive-In of Freeport
7. Port Drive-In of Port Lavaca
8. Gemini Drive-In of Victoria

L.C.L. is dominated by John G. Long, an eighty-two-year-old resident of Bay City, Texas. He is now and has always been the principal stockholder and, with the immediate members of his family, the sole owner of L.C.L. He also does business personally as Long Realty Company, owning in fee the real estate on which several of the theaters are located. Thus, John G. Long, personally, is the landlord of many of the theaters

in the circuit. From time to time, he has been a substantial creditor of L.C.L., a circumstance which will become of more than background significance. Although L.C.L. once operated or owned between forty and fifty theaters, it now has less than ten (tr. 56). John G. Long, in addition to his theater and real estate businesses, is the owner and operator of two radio stations located in Bay City and Texas City, respectively.

During all pertinent times, the distributors' films have earned approximately 75 per cent of the total box office nationally. In 1975, approximately One Billion, Four Hundred Million Dollars was taken in by the nation's theaters. Each distributor maintains executive and sales offices in the Cities of New York or Los Angeles, with numerous branch offices throughout the country, including Dallas, Texas. Dallas is a central distribution point within Texas. The "booker," or purchasing agent, for The Long Circuit maintains his office in Dallas, Texas. The distributors license pictures to exhibitors, including The Long Circuit, either on a "flat" rental rate, a sum owed regardless of the film's success, or on a "percentage" basis, with rental calculated as a fraction of the gross admission receipts at the box office. While some rental terms are agreed to before a film is shown, with an understanding that the rate is final, most film is let upon terms negotiated after the exhibitor has had box office experience with the film. Some films are licensed with this future settlement expressed in the licensing agreement. The custom and practice of the industry in the area and with the film here at issue was to settle after the film was shown, absent a contrary agreement. A rental contract, in which the amount of the rental is determined after the film has played, is referred to as a "terms later" contract.

Defendant, Burton H. Hanft, d/b/a Sargoy, Stein & Hanft, is a member of the New York Bar. Whether he is engaged in the practice of law is disputed. In any event, his firm is unique, both in its makeup of personnel and its specialty. Of the firm's 55 employees, two are attorneys. The great percentage of employees are persons with training in accounting. The firm's "practice" is confined to the eleven distributor claimants in this suit, furnishing them with a sophisticated policing of the reporting of box office receipts by motion picture exhibitors-licensees. At the beginning of a year, the distributors agree to pay the expenses of the firm as anticipated by a pro forma budget, plus the fee of Mr. Hanft. A principal part of these services includes reviewing the box office receipts as reported by the exhibitors against the reports of Sargoy's own checks. When a check of the box office receipts is done with the knowledge of the exhibitor, it is referred to as an "open check," but when done covertly, the check bears the somber sobriquet of "blind check." These checks, both blind and open, together with other auditing of exhibitors, may lead to the recommendation that "counsel" be employed, meaning the retention of a law firm for potential litigation. Sargoy does not alone prosecute such actions, but assists the law firm. A substantial part of Sargoy's work is as a consultant to law firms representing distributors in anti-trust matters. The firm also assists the distributors in connection with problems of film "piracy," a blatant form of trademark infringement.

## II.

### The Anti-Trust Claims

The Long Circuit abandoned at trial any claim for money damages and limited its claim to declaratory and injunctive relief. Three violations of the anti-trust laws are asserted.

First, the concerted assertion of the claim for the recovery of film rental not paid because of alleged under-reported gross revenues from the box offices is said to constitute price fixing. Second, this concerted claim is said to be an abusive use of monopoly power possessed by the combination of movie distributors. Third, The Long Circuit claimed that there was an agreement among the distributors not to settle individually, but to negotiate as a group;

that such agreement violated the anti-trust laws.

Because the merit of the claim for unpaid film rental is central to all, it will be ruled upon first. For example, the contention that the concerted claim is a guise for the fixing of higher film rental cannot survive a finding that the amounts claimed are only those contracted for and not paid by The Long Circuit. There is no assertion that the original rental terms or the rates negotiated on "terms later" contracts, upon the reporting by The Long Circuit of its box office receipts, were the product of an illegal combination. Otherwise stated, the combined effort to collect unpaid rental, if well founded, can hardly have price fixing as its purpose and an incursion into the free market pricing mechanism as its effect. Whether determinative or not, the anti-trust claims must be viewed in a different light if the counterclaim is not a sham.

### III.

*The Claim for Fraudulent Under-reporting*

1. The Records and the Role of Box Office Tickets:

An exhibitor obviously has two sources of revenue. He receives the price of admission, simultaneously producing a captive market for the sale of candies, drinks, popcorn and a miscellaneous assortment of other snack foods. The critical fact in the ascertainment of accurate gross box office receipts is the number of patrons. Each theater in The Long Circuit completed a report each day that reflected the number of dollars taken in for the sale of tickets on that day. A record of the concession sales was also kept. Over the years, the industry has come to rely upon the phenomenon that the box office receipts tend to bear a relatively constant relationship to the receipts for the sales of concessions. That relationship creates a check of one against the other.

The record providing the most accurate check upon the box office receipts is the admission ticket. If controlled and serially numbered tickets are used, almost irrefuta-

ble proof of the accuracy of the theater's reporting is created. Because an exhibitor faces quarrels with its distributor regarding the accuracy of its reported box office receipts, faces the inevitable questions of the Internal Revenue Service and, as a circuit, faces the demand for a simple system of policing the many theater managers, it is difficult to understand a deliberate policy of using tickets that avoid all such advantages; at least an honest motive is difficult to fathom. Not only did The Long Circuit not use serially numbered tickets at any time during the claim period, it specially ordered tickets without such numbering. Moreover, The Long Circuit, from January 1, 1966, to November 20, 1973, purchased over five million tickets and for that period was unable to account for over 240,000 tickets. The only claimed justification for this practice was that many years ago, Mr. Long discovered that his competitors could, by making ticket "buys" at the opening and close of the box office, gain information as to his gross. Yet, since 1948, The Long Circuit has paid in excess of $700,000.00 in settlement of claims for under-reporting similar to the distributors' present claims. Serially numbered and controlled tickets could have furnished dramatic proof of The Long Circuit's innocence (or guilt). One can only reasonably conclude that The Long Circuit either decided that such box office information in the hands of creditors was of extraordinary value or that avoiding revealing records was important for other reasons. The plain fact that competitors could gain similar information by the use of "checkers" further erodes any semblance of credibility of Mr. Long's claimed justification for The Long Circuit's use of uncontrolled tickets. Thus, the deliberate choice of The Long Circuit to persist in the use of these non-revealing tickets is under all these facts a probative badge of fraud.

2. The 1972 Audit of The Long Circuit:

In the fall of 1972, Sargoy, Stein & Hanft conducted a field audit of The Long Circuit's records. This examination revealed that the books and records of the Circuit were accurately tied to the box office re-

ports submitted by the individual theaters of the Circuit. The audit also confirmed that The Long Circuit's records agreed with the records obtained from open checks. This examination furnished the distributors with the Circuit's figures for gross receipts on unchecked engagements, concession expenses, and income for each theater. Any thorough investigation of a substantial "skimming" of box office receipts would include the examination of the bank records where a revealing paper trail would likely have been created. John G. Long refused to allow that examination. Only bank records were so guarded. Long did allow an examination of the bank deposit receipts attached to the box office reports which, of course, were conforming. But other records, such as bank statements, were not released.

### 3. The Blind and Open Checks:

During the claim period, more than 900 open checks of the eight Long theaters involved in this claim were conducted. The open check is conducted by an inspector, who identifies himself to the theater manager and informs him that he is there to check the evening's receipts. In the conventional, or four-wall, theater, the checker usually positions himself to be able to count the patrons. In drive-in theaters, the number of patrons per car are checked. Through the period, the results of the open checks and the reported box agreed. Two additional facts were revealed by the open checks. First, the grossing potential of the theater was suggested and, second, in the Long drive-in theaters, the ratio of patrons to cars met the national norm of 2.2 per car.[1]

As mentioned, a "blind check" consists of sending a person to a conventional or drive-in theater to count the people who purchase tickets or the number of cars, respectively. During the relevant period, approximately 146 blind checks were conducted on the eight theaters at issue. Of these, 79 re-

vealed substantial discrepancies between the gross admissions receipts calculated from the checkers' reports and the gross admissions as revealed by the box office report. Given the number of checks and the wide disparities over the period, substantial and systematic under-reporting is indicated, unless one is to discredit the blind checks almost in their entirety. Such avoidance of their results is not warranted. The Long Circuit and its expert, Mr. Bubis, (as discussed, *infra*) debunk the accuracy of the reports of blind checkers pointing to a lack of training of the checkers, the presence of non-paying employees in the theaters to be counted and the incentive of the checkers to exaggerate their reports in the belief that their employers wanted a large box office. The fact is that the checkers used were hired not by Sargoy, but by companies such as the Retail Credit Association. Moreover, no credible explanation was offered for the consistent absence in reported box office receipts of differences between the open checkers' reports and the theaters' box office receipts with equally consistent differences between the reports of blind checks and box office reports. Some "conforming" of result of the check to the actual report may have occurred as the checker and manager worked side-by-side, but this is a weak answer to the 900 checks conducted, and such checks do not stand alone. The concession to gross receipts ratio also developed unexplained swings on blind check days. Either the theater audiences experienced greater appetites for food and drink on blind check days than open check days or the managers were "dumping" portions of the box office receipts into the concession sales. Moreover, according to The Long Circuit's books, the concession sales were not accompanied by increases in the sums spent by the theaters for the concession products, despite their rising costs throughout the period. The reappearances day after day of precisely the same dollar figure (to the penny) of concession sales reported by the theater are

---

1. The Long Circuit can take little solace from the conformity of its records to those of the open checkers. It is that very conformity as

juxtaposed to the disparity between the blind check and the box office reports that is so revealing.

also left unexplained. More accurately, their fabrication is unexplained. To consistently add a portion of the box office receipts to the concession receipts would only invite detection. The use of an arbitrary number could be used to avoid that possibility. The lack of imagination reflected by using the same precise numbers time after time is not an imperfection in the scheme but in its execution.

4. The Statistical Battle and the Experts:

The significance of the data gathered by these checks and by the audit was explained by three witnesses. So much of the case is laid open by their testimony that a complete review of their testing and opinions is necessary.

A. The Study by David Fallick:

Fallick's background includes some 32 years as an employee of Sargoy (or its predecessors), preceded by experience as a bank auditor. This time has been largely consumed with efforts to monitor the box office reports of exhibitors of films distributed by Sargoy's clients. Fallick is not a statistician and is not competent to present testimony requiring such expertise. But the result of his work, although weak standing alone, gained strength from the independent analysis of Dr. Peterson (as discussed, *infra*). Fallick's work may be roughly grouped into twelve sections.

(1) Fallick tested for "actuals" by comparing the daily box office reports submitted by the exhibitor to the distributors (tr. 1758–59) (exh. 224, tr. 1752). The exhibit covered the period January, 1966, through November, 1973, with "cash flow" sheets for each of the theaters, plus the Port Twin Drive-In, Port Lavaca (tr. 1760).

(2) The ratio of patrons to cars was calculated from open checks (tr. 1764), indicating a close correlation to the national average of 2.2 patrons per car.[2]

(3) The ratio of patrons to cars was calculated from blind checks (tr. 1765).

Fallick then made comparisons, ratio calculations and recapitulation of blind checks.

(4) Comparison of blind check days by average to average of unchecked days for Fridays and Saturdays (tr. 1769). (See tr. 1772 for description of 1968–1969.)

Comparison of 1966 to October, 1972, reflecting average admission receipts for open and unchecked Fridays, Saturdays and Sundays, e. g., for El Rancho Theater: There were 134 open checks for the period, with 783 unchecked days, reflecting an average higher box office receipt for open check days of $659.00, or 62 per cent.

(5) Comparison of concession to admission receipts for open and unchecked days for the time period January 1, 1968, to October 31, 1972. The result was a ratio of 52.9 on open check days as compared to 74.8 per cent on the unchecked days. This recited calculation was for the Surf Drive-In in Freeport. The ratios for the other theaters were as follows:

(a) El Rancho: Open checked of eleven per cent, with unchecked of 23.5 per cent.

(b) Velasco: Open checked of 11.1 per cent, with unchecked of 14.4 per cent.

(c) Showboat of Texas City: Open checked of 22.4 per cent, with unchecked of 29.1 per cent.

(d) Showboat of Bay City: Open checked of 47.1 per cent, with unchecked of 66 per cent.

(e) Gemini Twin: Open checked of 36.5 per cent, with unchecked of 50.4 per cent.

(f) Port Drive-In: Open checked of 34.5 per cent, with unchecked of 47 per cent.

(g) Surf Drive-In: Open checked of 52.9 per cent, with unchecked of 74.8 per cent.

(6) Comparison of the El Rancho Theater and Uptown Theater in Victoria (El Rancho

---

2. Most of the open check films played before 1970. Most of the blind checks were made after 1970.

is owned by L.C.L. and the Uptown by Frels, a competitor). (See tr. 1786).

> (a) Comparison of average first week's gross for film for the years 1970–1971 (the houses played different films due to a split).
>
> (b) Comparison of average of first-run gross film with comparable national film rentals played at both the El Rancho and the Uptown (Frels). The national rentals were broken at $2 million, $4 million and $6 million gross. This showed that for 1966 through 1972, the Uptown on first-run film grossed more. (Average gross of $1,801.00 to $2,597.00.) (tr. 1793).

(7) Comparison of box office gross of film playing within thirty days of each other at the Texas Theater in Bay City, Uptown Theater in Victoria (Frels) and the El Rancho Theater (tr. 1795) showing that over the time period, the Uptown averaged 2.6 times the gross of the Texas Theater.

(8) Calculated Surf Drive-In ratios of patrons to cars on open check days (tr. 1805).

(9) (Exh. DF–3) Surf Drive-In indicating the number of days that specific concession receipts were repeated, e. g., 48 of 90 days have the same numbers. (tr. 1810).

(10) Ratio of concession receipts to admission receipts for the years 1968–1971 for the Surf Drive-In, with the highest ratio of 53.6 per cent for 1969; 62.4 per cent for 1970; and 67.7 per cent for 1971. This is upon open checks. (During the period, there were a total of 971 open checks.) (tr. 1816).

(11) Recapitulation of blind checks (tr. 1819), e. g., the Surf Drive-In had 31 blind checks during the period, 28 of which showed a difference between the gross as reported by the checker and the daily box office report of the exhibitor (tr. 1822).

(12) Fallick calculated a 106.1 per cent test check ratio of under-reported receipts to reported receipts where the blind checks had reflected a discrepancy (tr. 1844). Total under-reportings were then calculated by totaling all of the unchecked gross income figures and applying the test check ratio to them. This resulted in an estimate of under-reporting for each theater (tr. 1844). The test check ratio varied theater by theater, e. g., it was 128.8 per cent for the Showboat Twin Drive-In in Bay City (tr. 1845–49).

This test did not include the El Rancho Theater because there was insufficient "blind" data to establish a test check ratio (tr. 1849). Hayden Curtiss, its manager, testified that he could often spot the checker, and this was tendered as the reason for using a different test for under-reporting for the El Rancho. The El Rancho was compared with the Frels-run Uptown theater. The result of the calculation was to create a ratio of 73 per cent to arrive at an estimated under-reporting of $313,544.00.

Using the concession receipts to box office gross ratio of open checks to blind checks, an under-reporting of 32.2 per cent was arrived at for the Texas Theater (tr. 1852).

The conclusion of Fallick's calculations was an estimated under-reporting of $1,246,972.00 (tr. 1855). This figure, exclusive of income received on open check days and income from film rented from non-party distributors, should be compared with actual reported gross receipts of $1,671,261.00 (tr. 1856).

B. The Study of Dr. Peterson:

Whatever be the probative value of the tests performed by David Fallick, the movie distributors employed an expert to study the statistical implications of the data generated by Sargoy in the 1972 audit. The results not only support the basic conclusions of Fallick, but point strongly to the conclusion that massive and consistent fraud has been practiced by L.C.L.

Dr. Peterson is a trained statistician and professor of business and finance at the University of Texas. When engaged by the distributors, he was asked two questions: First, whether there was a difference between the reported revenues and the actual revenues for eight L.C.L. theaters for the period 1966 through October, 1973. Second,

if so, ". . . to estimate the extent of the difference between the reported revenues and the actual revenues . . ." (tr. 2027). His work can be divided into eleven steps, or categories, which, though not in logical sequence, assist in understanding his work:

(1) A comparison of the average revenues on open check days versus unchecked days (exh. 288) on a theater-by-theater basis. The study included all of the open checks for Fridays, Saturdays and Sundays, compared to the unchecked average daily revenues for comparable days (tr. 2030). The resulting differences, when subjected to statistical tests, reflected odds of one in 1,000 that the differences could have been the product of chance (tr. 2031). This test utilized not blind-check but open-check data. In other words, significantly here, The Long Circuit was the source of both figures being compared. Unless explainable as reflecting differing film quality, the test itself provides compelling evidence of under-reported box office receipts.

Dr. Peterson, in an effort to adjust for the impact of any quality differences, developed an "index." He computed averaged final percentage contract terms for the unchecked and open-checked films. The test for quality influences proceeds upon the assumption that any quality differences in film will manifest themselves in the market place by the film's command of rental. An average of the prices actually commanded by the checked versus the unchecked films resulted in an adjustment factor (tr. 2038). For example, the adjustment factor for the Showboat was 73 per cent (tr. 2039). Even after the adjustment factor, the potential for chance occurrence of the differences was one in 750 (tr. 2041).

Upon the foregoing, Dr. Peterson answered the first question, "Yes, there was under-reporting," and he did so without the use of data obtained from blind checks.

(2) By simply multiplying the percentage (reported gross of checked and unchecked, as adjusted for film quality) against the reported amounts, Dr. Peterson calculated under-reporting for the period at $1,169,-500.00 for the seven theaters (tr. 2042).

(3) The second analysis employed blind check data to validate the estimated under-reporting. This test used the three drive-in theaters of The Long Circuit (the Port Drive-In was eliminated due to insufficient data.) Comparing reported income to blind check income, a percentage of under-reporting was calculated. The resulting under-reporting for the three drive-in theaters was $679,100.00 (tr. 2046).

(4) Dr. Peterson then performed a concession check analysis for the conventional theaters (tr. 2046). This was a comparison of the ratios of concession sales to ticket sales for open check and unchecked days (exh. 232, tr. 2046). Thus, for the El Rancho, the Showboat and Velasco, Dr. Peterson calculated an under-reporting percentage, respectively, of 66 per cent, 35 per cent, and 62 per cent, resulting in an estimated under-reporting of $515,300.00 (tr. 2048). The Texas theater was omitted because its concession sales were not reported daily but were lumped together for two to three days at a time, making impossible an accurate use of the concession sales analysis method (tr. 2048).

(5) The resulting total from the open-check versus unchecked revenue was $1,169,500.00, compared to the blind check and concession analysis of $1,194,400.00 (tr. 2049).

(6) Dr. Peterson calculated the average number of patrons per car on open check days and blind check days and compared them with the patrons per car of 114 Texas drive-in theaters not associated with The Long Circuit (tr. 2050). There was no significant difference between patrons per car for open and blind check days for the 114 other theaters. A detailed study of the Surf Drive-In revealed that in 23.1 per cent of blind check days, there was less than one patron per car—an interesting phenomenon. On open check days, the Surf Drive-In had more than two patrons on 63.5 per cent of the checks, compared to 71.1 per cent for the 114 Texas drive-in theaters.

(7) Dr. Peterson then presented graphical depictions of these relationships (exhs. 237–39).

(8) For the calculations, Dr. Peterson worked with 580 open checks conducted through the period on Fridays, Saturdays and Sundays.

(9) Moving away from his check of weekends, Dr. Peterson examined the checks for Mondays through Thursdays and found even more under-reporting (tr. 2059). The total number of open checks for the entire time period was approximately 900 (tr. 2060).

(10) Because only about twelve per cent of the open checks occurred in the period 1970–1973, Dr. Peterson analyzed the differences between the checks of the two periods. He found a difference of only three percentage points in the extent of the under-reporting, concluding that the disparity in the number of open checks in the before-and-after-1970 periods did not invalidate his usage of all the checks (tr. 2062). The same conclusions were reached for the use of blind check data for the two time periods (tr. 2063).

(11) Dr. Peterson then calculated damages (tr. 2067). This was done by multiplying Dr. Peterson's calculated revenue for each of the seven theaters by the average film rental that it had paid. For example, the Surf Drive-In had revenue of $369,-600.00, with average film terms of 33.4 per cent, resulting in a film rental due of $123,-400.00, less the rental paid of $78,600.00, equaling a sum due of $44,800.00. Following this process for the other six theaters, Dr. Peterson arrived at a damage figure of $429,200.00. This calculation employed the final net terms of film rental as distinguished from any "front" amount. Because this figure is the product of negotiation between the distributor and the exhibitor, based on actual performance of the film, any under-reporting would have had a deflating effect upon the final terms. Upon this premise, that this figure would not represent a full recovery from the impact of under-reporting, Dr. Peterson calculated a damage figure which employed contract terms and net final negotiated terms for film rental. Otherwise, the method of calculating the claim is the same (tr. 2068). The damage figure, using the higher rental rate, is $776,100.00. Finally, Dr. Peterson took the mean of the two figures as his final damage sum—$602,600.00.

## C. The Testimony of Ralph Bubis (tr. 2135–2236)

The Long Circuit attempted to overcome the work of Dr. Peterson with the testimony of its expert, Ralph Bubis. The failure of this effort may be attributed in part to the fact that the work of Dr. Peterson, over 100 hours in preparation, was reviewed by Bubis only the evening before his court appearance. He had done some work earlier, in 1975, but apparently on other issues. Despite this lack of effort Bubis was of the opinion that the work of David Fallick, with over 32 years' experience in auditing exhibitors, and with bank auditing experience before that, was absurd. Despite the harshness of that judgment, Bubis never elaborated. Instead, the focus of his attack was the work of Dr. Peterson. Mr. Bubis conceded that he did not know of a better approach than Dr. Peterson's, but contended Peterson's task was impossible. Bubis' quarrel with the Peterson work was focused upon two circumstances.

First, Bubis urged that the accuracy of the blind checks had not been statistically validated and contained a risk of error unacceptable to him. Although there is doubtlessly a margin within which a "checker" will err, common sense tells us that despite all of the "expert" testimony and the claims of Bubis as to the difficulty of a checker's work and the training a checker should have, we are talking about the counting of cars and the counting of people in theaters hardly of the large metropolitan variety. Bubis was reluctant to credit the data with *any* value, an absurd position, to use his words.

The second quarrel of Bubis with the Peterson work is that the checks, blind and open, cannot form the base of a projection

because they were not arrived at by the use of proper sampling techniques and they present differences explainable by factors, or "biases," other than under-reporting, such as differences in film quality. He discounts Peterson's effort to adjust for any differences in film quality by use of market-tested values, the earnings of the film. Although the quarrel with the adjustment for film quality is without merit, Bubis' point regarding the adequacy of the sample is not without merit. In a perfect setting, a perfect statistical base ought to be required; the imperfect setting here was the creature of L.C.L.

### 5. John G. Long's Subsidy of L.C.L. Theatres, Inc.[3]

L.C.L. Theatres, Inc., has not earned a profit in any year for the past 25 years. Its sustenance has been John Long. Long has had a steady "line of credit" to the company over the years which at trial exceeded $1 Million. Long gave only vague explanations as to the source of the funds and virtually no explanation as to why he has continued this "charity" for 25 years. The charge that L.C.L. was being loaned its own monies was only denied in conclusionary terms. But as otherwise noted, the large and unexplained "loans" to L.C.L. overhang the entire case.

### CONCLUSION AS TO UNDER–REPORTING CLAIM

Small rivulets of facts in this case have flowed together and form one powerful unanswered stream. Bubis' points, if not the product of reflection, are not frivolous, but they are simply overwhelmed by the confluence of circumstances that lead to the inescapable conclusion that fraud of massive proportions has been perpetrated. Upon this record and implicitly found in the foregoing narrative are four ultimate findings of fact with regard to the claim of fraud and two with regard to the claimed breach of contract.

*Fraud*

1. The gross admissions receipts reported by L.C.L. Theatres, Inc., to the distributors pertaining to unchecked percentage engagements during the period January 1, 1966, to November 20, 1973, were substantially understated, and such understatements were known to be false at the time they were made.

2. L.C.L. Theatres, Inc., did not pay any film rental on the amount of the under-reported receipts. Film rental is due and owing on such under-reported receipts.

3. The gross admission receipts reported by L.C.L. Theatres, Inc., on unchecked percentage days were intentionally understated for the purpose of inducing the distributor to rely thereupon and to induce an adjustment of the film rental to a lower percentage than would have been paid if the box office receipts had been fully and honestly reported.

4. The distributors did in fact rely on such statements of box office receipts by accepting a lesser amount and percentage than they would have accepted as payment for film rental due.

*Contract*

1. Fraudulent under-reporting of the box office receipts realized by the exhibition of a particular motion picture film constitutes a material breach of the license agreement by L.C.L. Theatres, Inc.

2. The continuous and systematic fraudulent under-reporting of box office receipts engaged in by L.C.L. Theatres, Inc., indicates that all license agreements providing for the percentage rental of motion picture film were materially breached by L.C.L. Theatres, Inc.

*The Law of Fraud:*

A. The Elements:

■ The Long Circuit does not concede that an intentional under-reporting of box office receipts necessarily contains all of the elements of fraud under the law of Texas,

---

**3.** See, also, Section 8 of opinion regarding personal liability of Long.

but contends that the element of reliance is missing. There is no need here to resort to the analogy of the development of the concept of the material omission under Rule 10b–5 of the Securities and Exchange Act of 1934 because there was reliance by the distributors upon the representation as to the accuracy of the box office reports. Although in the negotiation of film rental contracts with "terms later" provisions, reliance upon the amount of the box office receipts is patent, on all contracts the acceptance by the distributors of the amounts actually paid was in reliance upon the representation that the tendered sums were the agreed-upon percentages, that is, reliance was present regardless of the type of rental contract.

### B. Limitations:

The above factual narrative contained, at least implicitly, the critical fact findings with regard to the limitations issue, but they are explicitly five in number:

1. Four of the six discrepancy blind checks of The Long Circuit during the period 1966 through 1970, were brought to the attention of John G. Long by the distributors. These alleged discrepancies were denied by him.

2. The number of blink checks of The Long Circuit was increased in the fall of 1971 and the results of these checks were brought to the attention of Sargoy early in November, 1971. Thereafter, Sargoy recommended to its clients that it be authorized to conduct an audit of The Long Circuit's books and records, and Sargoy also intensified the checking of The Long Circuit, during the end of 1971 and 1972 and subsequent years.

3. Before November 20, 1971, Sargoy did not have the following information necessary to make its analyses: (a) The daily concession figures (concession analysis); (b) The reported gross admissions on days which were unchecked (open versus un-

checked analysis); and (c) Ticket invoices and inventory (ticket analysis).

4. The substantial and continuous pattern of under-reporting was not discovered, nor could it have been discovered in the exercise of due diligence, until early in 1973, after the intensified checking results were received, an audit had been completed, and the post-audit analyses made.

5. The essence of the fraud was its concealment and The Long Circuit affirmatively concealed the under-reporting by such acts as using only tickets which would avoid "house counts" by "ticket buys" and refusing to grant access to bank statements.

#### (a) Fraud:

Whether such affirmative concealment tolls the running of the applicable Texas two-year statute of limitations (Tex. Rev.Civ.Stat.Ann. Art. 5526 § 4(1925) or only provides probative evidence of the conclusion that the distributors did not within the prohibited period discover the fraud, or failed to exercise due diligence to do so, the result is the same. Certainly, under Texas law, the two-year statute of limitations [4] does not commence to run absent such discovery or absent the lack of due diligence. *Pena v. First State Bank & Trust Co.,* 404 S.W.2d 56 (Tex.Civ.App.—Corpus Christi 1966, No Writ).

Although some reports of blind checks reflecting discrepancies between the box office reports of The Long Circuit and the reports of the checkers were made before November, 1971, most were made within the Texas two-year statute, i. e., 1971 to 1973. Moreover, the distributors did not know before November, 1971, that L.C.L. had never made a profit but survived upon the credit and whim of John Long. As noted in the narrative discussion of the expert testimony of Dr. Peterson and Mr. Bubis, it is the consistency of the results of the checks, coupled with the concession

---

4. There shall be commenced and prosecuted within two years after the cause of action shall have accrued, and not afterward, all actions or suits in court of the following description: 4.

Actions for debt where the indebtedness is not evidenced by a contract in writing. Tex.Rev. Civ.Stat. Art. 5526 § 4 (1925).

analyses, other open check data and evidence of potential theater performance gathered after November, 1971, that points to fraud. It is true that more than two years before the filing of this suit the distributors knew that The Long Circuit was not using serially numbered tickets and that this fact, coupled with the disparities of reported and blind checked box office receipts, present a close fact question as to the exercise of due diligence to discover the fraud. Yet, it must be kept in mind that this factual determination must take into account that it was not a single act of fraud to be discovered as, for example, a material omission found in such cases as concealed termite damage or a concealed defective foundation in the sale of a house, but a pattern of conduct, the very purpose of which was concealment. Moreover, the court is cognizant that the distributors' claim is a vivid mosaic painted square-by-square. Having viewed the total picture, it is a difficult task to commence a process of removing the tiles, one by one, to see when the picture loses its identity or to perceive when one, not wholly a stranger to such a picture, in the exercise of reasonable care, ought to have guessed its ultimate identity. Having carefully weighed the evidence and judged the credibility of the witnesses, the court resolves this factual question in favor of the distributors.

By way of further rejoinder to The Long Circuit's plea of limitations, the distributors[5] rely upon Art. 5539c V.A.T.S.[6] which avoids the limitations defense where " . . . a counterclaim or cross claim would otherwise be barred . . . provided that the counterclaim or cross-claim arises out of the same transaction or occurrence that is the subject matter of the opposing party's claim." The Long Circuit urges that Art. 5539c applies only to counterclaims not barred on the filing date of the complaint but barred by the answer date.[7] There is no record from which a legislative intent can be discerned, nor have the Texas courts answered the question of the applicability of the statute to counterclaims time barred on the date the complaint is filed. Reliance upon *Smith v. Lone Star Cadillac, Inc.,* 470 S.W.2d 791 (Tex.Civ. App.—Waco 1971, No Writ Hist.), is misplaced. The cross-claim there held to be saved by the statute was not barred on the date the main suit was filed. The weakness with The Long Circuit's argument is that the language of the statute does not limit its benefits to claims barred *only* at the answer date. The counterclaim arose from the same facts and transaction as the complaint; indeed, the assertion in concert by the distributors of the present counterclaim is at the heart of the complaint, and by the contention of The Long Circuit was barred on the answer date. The statute requires no more. The use of the word "extension" in the statute, rather than the word "revival" or other words of similar import, is not significant. Art. 5539c literally allows the assertion of counterclaims which have by answer date been barred, though not barred on the complaint date. In that sense, even under The Long Circuit's construction, "extension" is the wrong word. Contrary to The Long Circuit's contention, the filing of a suit does not open a plaintiff to any stale counterclaim. Only those counterclaims arising out of the same transaction as the complaint may be asserted. Long urges

---

**5.** American International Pictures was not sued by The Long Circuit and cannot take advantage of any benefits of Art. 5539c.

**6.** "In the event a pleading asserting a cause of action is filed under circumstances where at the date when answer thereto is required by law a counterclaim or cross claim would otherwise be barred by the applicable statute of limitation, then the party so answering may, within 30 days following such answer date file a counterclaim or cross claim in such cause and the *period of limitation is hereby extended for such period of time* provided that the coun-

terclaim or cross claim arises out of the same transaction or occurrence that is the subject matter of the opposing party's claim." (emphasis added). Art. 5539c.

**7.** The title to the Act in no way suggests such a limitation. An Act relating to extension of the period of limitation for cross-claims and counterclaims arising out of the same subject matter as the opposing party's claim; and declaring an emergency. Acts 1969, 61st Leg., ch. 240 at 701.

that the legislature would not have intended the irrational result of allowing this counterclaim. To allow a party to assert a claim otherwise barred when another insists upon suing about the transaction can hardly be described as an irrational legislative intent.

### (b) Contract:

■ The distributors contend that the two-year statute of limitations, Art. 5526, V.A.C.S., is inapplicable in that their claim also entailed the breach of the license contracts. The limitations period for breaches of written contracts under Texas law is four years. See Art. 5527 V.A.C.S. While the distributors' claim does sound in contract, the contract is both written and oral. Where the contract sued upon is part oral and part written, the two-year statute is applicable. *Barbier v. Barry,* 345 S.W.2d 557, 564 (Tex.Civ.App.—Dallas 1961, No Writ Hist.).

### *The Quantum of Damages:*

The narrative discussion above, reviewing the testimony of Fallick, Peterson and Bubis, demonstrates the presence of the fact of injury, i. e., the under-reporting of box office receipts. Given the fact of under-reporting, there remains the factual question of its extent and the related question, probably a blend of fact and law, of whether the distributors' method of proof is a presentation of a "fluid" theory of recovery. See *Eisen v. Carlisle & Jacquelin,* 479 F.2d 1005 (2d Cir. 1973), 479 F.2d 1005, 1011–12, vacated at 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).

There are several related and, at times, overlapping doctrines which together state the controlling standard for measuring the sufficiency of the damage proof. Professor McCormick [8] stated them in clear, black-letter form:

■ (a) If the fact of damage is proved with certainty, the extent or amount may be left to reasonable inference.

■ (b) Where the defendant's wrong has caused the difficulty of proof of damage, he cannot complain of the resulting uncertainty.

■ (c) Mere difficulty in ascertaining the amount of damage is not fatal.

■ (d) Mathematical precision in fixing the exact amount is not required.

■ (e) If the best evidence of the damage of which the situation admits is furnished, this is sufficient.

■ The Long Circuit's own actions have made more precise proof of damages impossible. The distributors' damage theory produced the most accurate and probative evidence available. Bubis, the counter-defendant's expert, admitted that he knew of no better method of calculating the amount of damages, although he quarreled with the reasonableness of what was done. To find the damage proof in this case insufficient as to the amount of damages would simply allow The Long Circuit to reap the benefits of its own fraud. Of course, the damage proof was not mathematically precise as to amount, but no better approach was available given the absence of access to bank statements and the failure to use serially numbered tickets, both matters within The Long Circuit's control. That is not to say that given proof of fraud, no certainty is required and "anything goes." It is to say that there is an inverse relationship between the degree of certainty required and the degree to which a party's wrongdoing infects more certain means of proof. This is no more than an expression of the maxim that one bears the brunt of one's own wrongdoing, here the risk of imprecise proof. The proof adduced meets this test. This conclusion is buttressed not only by the internal consistency of the calculations of the distributors, but by the court's confidence in the competence of Dr. Peterson, Mr. Fallick, and its lack of confidence in Mr. Bubis. While the approaches of the experts have otherwise been reviewed, it should be noted in this context that such confidence grew not only from a study of

8. McCormick on Damages, § 26 at 100, 101 (1935).

the array of statistical data presented through their testimony, but also from the court's observation of their demeanor and presence while on the witness stand and from a study of their backgrounds, experience and training.

The distributors denied that they were proceeding upon a fluid recovery principle and urged that in fact they had proved not only the amount of the total damage claim but, also, the injury suffered by each distributor.

The attached schedules (prepared by the distributors) have been reviewed by the court. They reflect a proper breakdown among the distributors of the total damages found. Though implicit in this narrative, the following findings are explicitly made:

(1) The damages to the counterclaimant motion picture distributors are found to be $429,200.00.

(2) There is attached hereto Schedule A, which shows the breakdown of the above damage figure between the eleven counterclaimants.

(3) There is attached hereto Schedule B, which shows the further breakdown of the total damages on a theater-by-theater and distributor-by-distributor basis. This sched-

ule is for the damages of $429,200.00 obtained by multiplying the calculated unreported gross receipts by the average final terms which were actually paid of 37.3 per cent.

(4) The final breakdown of the damage figure found in No. (1) above on a theater-by-theater and distributor-by-distributor basis is purely a matter of taking this damage figure of $429,200.00 through Dr. Peterson's calculation (see defendants' exhs. 228–31 and 241–42).

These schedules were not received into evidence but were submitted as attachments to the distributors' post-trial proposed findings. While The Long Circuit urges that because they were not received into evidence they should be disregarded, they are no more than arguments expressed in the form of numbers, reasonably deduced and supported by record evidence properly reviewed at trial; specifically, the "cut-off" cards. See defendants' (distributors') exh. 220, which is an assemblage of each picture and its theater play dates, distributors, gross box office receipts as reported by The Long Circuit, and film rental paid. From the calculations of gross damages (see exh. 243), discrete damage, by use of defendants' exhs. 228–31 and 241–42, is an arithmetical calculation.[9]

---

**9.** The distributors illustrated this by use of an example:

If the court selects the lowest possible amount of damages ($429,200.00), this means that if L.C.L. had honestly reported its total admission receipts, and if the film rental on that gross had been calculated at average final contract terms (an unrealistically low level), L.C.L. would have paid a total film rental of $1,149,600.00. It actually paid $720,400.00. Of the $720,400.00 actually paid, the Surf Drive-In paid $78,600.00 (this figure is derived from a search of the cut-off cards). Dr. Peterson's charts indicate that the Surf Drive-In actually had attendance which was 57 per cent higher than that reported. Do the simple multiplication problem, ($78,600.00 × 1.57), and you find that the Surf Drive-In should have paid a total film rental of $123,400.00 (rounded to the nearest hundred). The court's damage award has thus produced a pot of $44,800.00 ($123,400.00—$78,600.00) to be allocated among the distributors who were cheated at the Surf Drive-In. A second search through the cut-off cards reveals that Paramount received $7,000.00 in film rentals (rounded to the nearest hundred). By simply

dividing $78,600.00 into $7,000.00, you discover that Paramount films were responsible for nine per cent (rounded to the nearest per cent, actually, about 8.9 per cent) of the reported gross at the Surf Drive-In. It is presumably entitled to a similar percentage of the film rentals based on actual grosses. So you again multiply ($123,400.00 × .09) and find that Paramount should have received approximately $11,100.00 (rounded to the nearest hundred; actually, $11,106.00). Finally, subtract film rental paid ($7,000.00) from film rental owed ($11,100.00) and you discover that Paramount's share of the damages attributable to its films which played at the Surf Drive-In is $4,100.00 (as per Schedule B) at the final negotiated percentage terms.

Note that every number in the preceding paragraph is taken from exhibits introduced at trial, specifically, defendants' Exhibit 220, of Dr. Peterson's charts, or is arithmetically derived from such numbers in the manner described in the testimony of Mr. Hanft and Mr. Fallick. It is not necessary to refer to any information which was not put into evidence during the trial to make this breakdown.

While these calculations result in a damage sum for each distributor, the question remains whether that discrete sum is only the product of an arbitrary division of an otherwise fluid recovery or is a measure of injury distinctly suffered. This allocation is in the proportion that the film rental paid to each distributor bears to all distributors. Given the consistent pattern of under-reporting otherwise found, the relative percentage of the total business done by each distributor is an approximate measure of each loss. The fraudulent under-reporting was without regard to the film being shown, the play date or the distributor. This being true, the amounts received by each distributor relative to each other must bear a relationship to their relative losses. And no better proof, given The Long Circuit's fraud, is available.

The accusation that the distributors are by this proof attempting a fluid recovery is not instructive. The "fluid class" recovery prohibited by *Eisen v. Carlisle & Jacquelin, supra,* was an attempt at " . . . recovery whereby damages would be distributed to future odd-lot traders rather than to the specific class members who were actually injured. . . . " Id., 417 U.S. 156, 166, 94 S.Ct. 2140, 2147.

Thus defined, it is apparent that the distributors are not seeking a "fluid recovery," but seek damages they each suffered. There is no fluidity in this group of claimants. The fact that each of the distributors was injured was established by the proof of consistent under-reporting. It was the amount of damages of each which is derived from the allocation formulae here attacked. In a fluid recovery, the distributions from the damage fund will be made to claimants without regard to actual injury. The focus in fluid recovery upon the wrongdoers with the accompanying descriptive phrases of the process, such as disgorgement, by implicitly not requiring an injured plaintiff, also poses problems of concrete-

ness under Article III of the United States Constitution.

### John G. Long—Personal Liability

Having found L.C.L. liable for damages and having found the amount of the damages, there remains the question of the individual liability of John Long. The distributors urge that Mr. Long is liable because he personally participated in the fraudulent under-reporting, or at the least, directed its accomplishment. Alternatively, they urge that the corporate entity should be ignored on the basis that it was the mere alter ego of John Long. Obviously, these theories are here overlapping, if not coextensive.

John Long's argument that his domination of the affairs of L.C.L. was no more than what one might expect in situations where the stock is closely held suffers a mighty flaw. It ignores the fact that for over 25 years, this corporation never made a profit. Its source of funds, at least for that amount necessary to avoid the inevitable result of no profit, was John Long. At the time of trial, the company was indebted to him for a sum in excess of $1 Million. The debt to him is reduced from time to time but has always been substantial. The source of these monies was never explained, except for general references to the other businesses of Mr. Long, such as the real estate and radio station operations. Whether or not these were the sources of the funds is of some moment. The compelling inference is that these "loans" were of monies already belonging to the corporation but siphoned off. The operation of L.C.L. was no charity. The Long Circuit's own proof was that Mr. Long was a parsimonious and frugal man. There is no rational explanation for this conduct.[10] The salaries he paid, including his own, were extremely modest. This fact of no profit for so long, with the subsidization of Mr. Long, hangs like a cloud over this whole case. John

---

10. Certainly, there is room in this world for an eccentric who loves his theaters with such passion that he will subsidize their operation by gifts of credit, but such is true of many of the oddities of this case. Viewed alone, they are just that, curious deviations from the rationally explainable. Viewed collectively, however, the picture of fraud cannot be escaped.

Long is liable for his participation and for his abuse of the corporate entity by manipulatively using it as a tool of fraud. The following findings were proposed by the distributors and state well the findings implicit in this narrative:

1. John G. Long personally made the important decisions concerning the operation of L.C.L.

2. For more than 25 years, L.C.L. never made a profit according to its books, and it made up its reported operating losses through loans from John G. Long, individually, usually operating under the assumed name of Long Realty Company. L.C.L. owes to John G. Long, individually, notes and accounts payable considerably in excess of $1 Million, and a substantial part of this indebtedness has been outstanding for many years.

3. During the relevant counterclaim period, John G. Long was in personal charge of the operation of L.C.L. and he made frequent trips around the circuit to perform the duties of a circuit manager. One of his senior managers, with more than thirty years in his employ, testified to the effect that substantial under-reporting could not have occurred without John G. Long's knowledge.

4. More than five million non-serially numbered tickets were ordered by L.C.L. during the relevant period, with special instructions that the tickets be printed with "concealed" numbers. Mr. Long's long-time secretary and head bookkeeper indicated that the need for better ticket control was discussed with Mr. Long personally.

5. When the auditors from Sargoy, in 1972, asked Mr. Long for ticket inventory records, he told them that there were no such records. His secretary and head bookkeeper promptly reminded him privately that they did have such records, but he declined to correct his misleading statement.

6. Mr. John G. Long personally refused to permit the auditors of Sargoy to see the bank statements of himself or L.C.L.

7. Mr. Long owns and operates various corporations out of his headquarters in Bay City, Texas, including L.C.L. Theatres, Inc., J. G. Long Associates, Inc., Long Theatres, Inc., and Twin Ranch Theatres, Inc., in addition to his assumed name of Long Realty Company, in which identity he operates a radio station at Texas City and a radio station at Bay City. He owns farm land, oil properties and real estate. Several of the theaters which are operated by L.C.L. are owned by Mr. Long, individually, or by one or more of his other corporations, and are leased to L.C.L.

8. Employees of the corporations owned or controlled by Mr. Long do not ordinarily differentiate between Mr. Long, individually, and his corporations, nor between his various corporate entities, nor was the work which they performed dependent upon the identity of their employer or the name in which their paychecks were issued.

9. John G. Long, individually, knew that two of his children filed suit against him to foreclose part of his stock in L.C.L. and in other companies on August 29, 1973, approximately one month before the present suit was filed on October 1, 1973. Notwithstanding the fact that he was duly served in that matter, he knowingly acquiesced in their obtaining a default judgment on October 2, 1973, which was approximately six weeks before the motion picture distributors filed their counterclaim in this cause on November 19, 1973. These matters were not disclosed by Mr. Long or his children until sometime later.

10. Mr. Long knowingly and personally participated in, approved and authorized the fraudulent under-reporting and fraudulent concealment of under-reporting which has been found in this case.

11. John G. Long, individually, and L.C.L. were the alter ego of each other

throughout the relevant period, and the acts of one were the acts of the other.

12. L.C.L. was the agent of John G. Long in carrying out the fraudulent under-reporting and fraudulent concealment which has been found in this case.

## IV.

### Anti-trust Claims Revisited

The general nature of the anti-trust claims asserted by The Long Circuit has been stated above. The discussion of the claims was deferred to a review and holding with regard to the distributors' claims for fraudulent under-reporting.

■ There has been no price fixing or other illegal conduct stemming from the exchange of information incident to the surveillance of The Long Circuit by the distributors and from the presentation of this claim. It is clear that Sargoy, whether it be regarded as a law firm or other business, was at all times acting as the agent of all the distributors. Accordingly, information furnished to them was arguably an exchange of information among its members, although it is undisputed that Sargoy did not disclose to the respective members the precise amount of sales by other clients.

A review of the Supreme Court's holding in *United States v. Container Corp.,* 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969) demonstrates why the exchange of information here does not run afoul of the proscription of Section 1 of the Sherman Act. In *Container,* there was an exchange of price information " . . . but no agreement to adhere to a price schedule as in *Sugar Institute v. United States,* 297 U.S. 553, 56 S.Ct. 629, 80 L.Ed. 859 . . . ". There was also an exchange of information concerning specific sales to identified customers. Significantly, as emphasized by Justice Douglas in *Container,* there was a finding that a competitor's knowledge of the most recent sales price of other competitors resulted in a stabilization of prices. The

Court noted that: " . . . the limitation or reduction of price competition brings the case within the ban, for as we held in *United States v. Socony-Vacuum Oil Co.* [310 U.S. 150, at 224, 60 S.Ct. 811, at 844, 84 L.Ed. 1129], interference with the setting of price by free market forces is unlawful per se.". The Court, in *Container,* emphasized that while price information exchanged in some markets may have no effect on a competitive price, the corrugated container industry was dominated by relatively few sellers. Although the distributors exchanging information represented upwards, of eighty per cent of the total film distribution, there were other critical factors present in *Container* which are here absent. In *Container,* the product was fungible and the competition for sales was in price. Here the products are not fungible and although price is seldom wholly irrelevant, the focus of competition in this industry is not price, but film quality. More accurately stated, competition is for those films which proved to have greater audience response. Moreover, the market is elastic, unlike the corrugated paper market in *Container.*

Critically, the record is totally devoid of any suggestion or proof that any exchange of information resulted in or tended to produce a stabilization of pricing. On these factors alone, one could conclude that there has been no impermissible exchange of information. There is an additional distinction between *Container* and this case which buttresses this conclusion. In *Container,* Justice Douglas emphasized that the case differed from *Cement Manufacturers Protective Association v. United States,* 268 U.S. 588, 45 S.Ct. 586, 69 L.Ed. 1104 (1925), " . . . viz, that cement manufacturers, to protect themselves from delivering to contractors more cement than was needed for a specific job and thus receiving a lower price, exchanged price information as a means of protecting their legal rights from fraudulent inducements to deliver more cement than needed for a specific job.".

The purpose of an exchange of information is not only a relevant but a significant litmus, whether the purpose is to avoid fraud as in *Cement Manufacturers Protective Association* or to avoid liability for price discrimination as in *Wall Products Co. v. National Gypsum Co.*, 326 F.Supp. 295 (N.D.Cal.1971). This is not to say that intent to fix prices is essential to a finding of price fixing. Such principle was rejected in *Container* itself. Although one may have, in exchanging data with a competitor, the purpose of avoiding fraud or avoiding the pincer's effect of attempting to achieve the benefits of Section 2(b) of the Robinson-Patman Act and simultaneously avoiding the perils of the Sherman Act Section 1 proscriptions against exchanging pricing information with competitors, violations may still be found. But when neither the purpose nor the effect is to stabilize prices, there is no anti-trust violation.

The Long Circuit also claims that the defendants have in some manner been guilty of monopolization by their utilization of monopoly power; but this claimed prohibited utilization of monopoly power is no more and no less than the concerted presentation of this claim. The consequence of the claim at issue is simply that the plaintiff (and Mr. Long) are being required to pay money they should have paid. There is no contention that the agreements, whereby films were leased from the several distributors, are in any way tainted by the distributors' combined market power, nor is there any evidence that the market position of the distributors in film distribution was being used to intrude into film exhibition. It was not the distributors' combined market power which troubles The Long Circuit,

it is the aggregation by them of bits and pieces of data into a whole and compelling claim.

While the plaintiff argued that there were concerted refusals to deal, the argument was not supported by any evidence, nor is there any evidence that the distributors refused to negotiate separately for possible settlements.

The Long Circuit's claim, cut to its core, is that illegality stems from the circumstance that, in its view, the distributors would have been unable to prove their case without combining their evidence. That is, if each of the distributors had been required to separately prove its claim, under-reporting could not have been proved, and as a consequence no sums owing would have been found. One quick answer to this contention is that if each of the distributors had presented its claim in a separate trial, virtually all of the evidence of under-reporting produced here could have been produced at each trial. Only one distributor as a party would not have so confined the evidence. The common course of action in reporting box office receipts would have been admissible. To the extent that The Long Circuit's quarrel is with the joint effort to gather the evidence, it is answered by *Cement Manufacturers*.

Even if the combined efforts are, contrary to the holding of this court, tainted with anti-trust illegality, plaintiff has wholly failed to show the fact of injury. No injury can be found from a requirement that owed bills be paid. The anti-trust claims presented are without merit. The claimed injunctive relief is denied.

See table on following page.

Schedule "A"
FINAL DAMAGE SUMMARY*

| Average Original Terms | PARAMOUNT | METRO-GOLDWYN MAYER | T.C. FOX | WARNER BROS. | BUENA VISTA | UNITED ARTISTS | UNIVERSAL | COLUMBIA | ALLIED ARTISTS | AMERICAN INT. PICTURES | ATCO EMBASSY | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 48.6% | $116,400 | $ 44,200 | $188,600 | $145,900 | $11,600 | $100,100 | $34,200 | $69,100 | $ 8,500 | $30,300 | $27,200 | $776,100 |
| 47 1/2% | 111,400 | 42,300 | 180,400 | 139,600 | 11,100 | 95,800 | 32,700 | 66,100 | 8,200 | 28,900 | 26,030 | 742,500 |
| 45% | 97,900 | 37,930 | 161,800 | 125,100 | 10,000 | 85,900 | 29,300 | 59,200 | 7,300 | 26,000 | 23,300 | 665,750 |
| MEAN | 90,400 | 34,400 | 146,500 | 113,300 | 9,000 | 77,800 | 26,500 | 53,600 | 6,600 | 23,500 | 21,100 | 602,700 |
| 42 1/2% | 83,300 | 33,600 | 143,100 | 110,700 | 8,600 | 76,000 | 25,900 | 52,400 | 6,500 | 23,000 | 20,600 | 588,900 |
| 40% | 76,500 | 29,200 | 124,400 | 96,300 | 7,700 | 66,100 | 22,500 | 45,600 | 5,600 | 20,000 | 17,900 | 512,100 |
| 37 1/2% | 65,300 | 24,800 | 105,600 | 81,800 | 6,500 | 56,200 | 19,200 | 36,700 | 4,800 | 17,000 | 15,200 | 435,300 |
| Average Negotiated Final Terms ** — 37.3% | 64,400 | 24,500 | 104,300 | 80,700 | 6,400 | 55,400 | 18,900 | 38,200 | 4,700 | 16,700 | 15,000 | 429,200 |

*Based on comparison of open checked to non checked days.

**Based upon actual film in round paid on all non-open checked engagements. This negotiated percentage is generally low because of the fact that the exhibitor underreported and used the misleadingly low gross to negotiate a low percentage settlement on those engagements upon which settlements were made. The exhibitors' scales go up in increments of 2 1/2%, which are shown above with the corresponding unpaid film rental.

Schedule "B"
L.C.L. THEATRES, INC.

DAMAGE CLAIM COMPUTED AT AVERAGE FINAL PERCENTAGE CONTRACT TERMS BY THEATRE AND DEFENDANT DISTRIBUTOR
1966-1973 (11/20)
(EXCLUDED OPEN CHECKED ENGAGEMENTS)

| Theatre / Percentage Increase * | Film Rental | Paramount | Metro Goldwyn Mayer | T.C. Fox | Warner Bros. | Buena Vista | United Artists | Universal | Columbia | Allied Artists | American Int. Pictures | Avco Embassy | Totals ** |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Surf D/E 57% | As calculated | $ 11,100 | $ 10,700 | $ 16,500 | $ 21,600 | $ 700 | $ 9,500 | $ 7,700 | $ 22,700 | $ 1,400 | $ 14,100 | $ 7,500 | $123,457 |
| | Previously paid | 7,000 | 6,800 | 10,500 | 13,800 | 400 | 6,100 | 4,900 | 14,500 | 900 | 9,000 | 4,700 | 73,567 |
| | UNPAID | $ 4,100 | $ 3,900 | $ 6,000 | $ 7,800 | $ 300 | $ 3,400 | $ 2,800 | $ 8,200 | $ 500 | $ 5,100 | $ 2,775 | $ 44,853 |
| Gemini Twin D/I 75% | As calculated | $ 23,500 | $ 5,800 | $ 33,500 | $ 25,700 | $ -0- | $ 24,700 | $ 3,300 | $ 6,400 | $ 1,800 | $ 7,900 | $ 4,000 | $135,600 |
| | Previously paid | 13,500 | 3,400 | 19,200 | 14,800 | -0- | 14,200 | 1,900 | 3,700 | 1,000 | 4,500 | 2,350 | 73,560 |
| | UNPAID | $ 10,000 | $ 2,400 | $ 14,300 | $ 10,900 | $ -0- | $ 10,500 | $ 1,400 | $ 2,700 | $ 800 | $ 3,400 | $ 1,770 | $ 58,100 |
| Shomboat/II 85% | As calculated | $ 14,400 | $ 10,500 | $ 14,000 | $ 14,000 | $ 700 | $ 14,200 | $ 7,800 | $ 14,300 | $ 1,700 | $ 11,400 | $ 4,600 | $107,600 |
| | Previously paid | 7,600 | 5,600 | 7,500 | 7,400 | 400 | 7,500 | 4,200 | 7,600 | 900 | 6,000 | 2,600 | 57,300 |
| | UNPAID | $ 6,900 | $ 4,900 | $ 6,500 | $ 6,600 | $ 300 | $ 6,700 | $ 3,600 | $ 6,700 | $ 800 | $ 5,400 | $ 2,000 | $ 50,550 |
| El Rancho 52% | As calculated | $ 66,900 | $ -0- | $111,800 | $ 85,100 | $ -0- | $ 62,900 | $ 300 | $ 300 | $ 2,300 | $ -0- | $ -0- | $323,... |
| | Previously paid | 44,100 | -0- | 73,600 | 56,000 | -0- | 41,500 | 200 | 200 | 1,500 | -0- | -0- | 73,600 |
| | UNPAID | $ 22,800 | $ -0- | $ 38,200 | $ 29,100 | $ -0- | $ 21,400 | $ 100 | $ 100 | $ 800 | $ -0- | $ -0- | $111,... |
| Showboat 72% | As calculated | $ 14,100 | $ 13,800 | $ 29,700 | $ 9,700 | $ 16,000 | $ 4,500 | $ 9,300 | $ 20,400 | $ 200 | $ 2,600 | $ 6,900 | $127,000 |
| | Previously paid | 8,200 | 8,000 | 17,300 | 5,600 | 9,300 | 2,600 | 5,400 | 11,900 | 100 | 1,500 | 4,000 | 73,900 |
| | UNPAID | $ 5,900 | $ 5,800 | $ 12,400 | $ 4,100 | $ 6,700 | $ 1,900 | $ 3,900 | $ 8,500 | $ 100 | $ 1,100 | $ 2,900 | $ 53,000 |
| Velasco 65% | As calculated | $ 8,200 | $ 12,600 | $ 25,100 | $ 26,200 | $ -0- | $ 7,400 | $ 4,100 | $ 9,300 | $ 3,100 | $ 6,600 | $ 5,000 | $127,... |
| | Previously paid | 5,000 | 7,700 | 15,200 | 15,900 | -0- | 4,500 | 2,500 | 5,600 | 1,800 | 4,000 | 3,000 | 65,... |
| | UNPAID | $ 3,200 | $ 4,900 | $ 9,900 | $ 10,300 | $ -0- | $ 2,900 | $ 1,600 | $ 3,700 | $ 1,300 | $ 2,600 | $ 2,000 | $ 45,... |
| Texas 55% | As calculated | $ 34,700 | $ 12,000 | $ 49,000 | $ 33,500 | $ -0- | $ 25,300 | $ 17,600 | $ 29,300 | $ 1,900 | $ 2,400 | $ 12,500 | $317,... |
| | Previously paid | 24,000 | 8,300 | 33,800 | 23,100 | -0- | 17,400 | 12,100 | 20,200 | 1,300 | 1,400 | 8,700 | ... |
| | UNPAID | $ 10,700 | $ 3,700 | $ 15,200 | $ 10,400 | $ -0- | $ 7,900 | $ 5,500 | $ 9,100 | $ 600 | $ 900 | $ 3,700 | $ 67,... |
| | As calculated | $172,900 | $ 65,400 | $279,600 | $215,800 | $ 17,400 | $146,500 | $ 50,000 | $102,700 | $ 12,400 | $ 45,000 | $ 39,800 | $1,423,500 |
| | Previously paid | 109,400 | 39,800 | 177,100 | 136,600 | 10,100 | 93,800 | 31,100 | 63,700 | 7,500 | 26,600 | 24,700 | 153,600 |
| | UNPAID | $ 63,500 | $ 25,600 | $102,500 | $ 79,200 | $ 7,300 | $ 54,700 | $ 18,900 | $ 39,000 | $ 4,900 | $ 18,400 | $ 15,200 | $...,... |

** As shown on Damage Claim II defendants' exhibit

Enclosed: Defendants' exhibit which shows gross receipts at each theatre underreported by the percentages concluded