**The JOHNS HOPKINS HOSPITAL,**
Plaintiff,

v.

**PEABODY COAL COMPANY**
**and Peabody Development**
**Company, Defendants.**

Civil A. No. 92–64.

United States District Court,
W.D. Kentucky,
Owensboro Division.

March 21, 1996.

George E. Stigger, III, Cubbage & Stigger, Henderson, KY, George A. Barton, and Scott K. Martinsen, Watson & Marshall, Kansas City, MO, for plaintiff.

W. Stanley Walch, Thompson & Mitchell, St. Louis, MO and Winfrey P. Blackburn, Jr., Blackburn, Hundley & Domene, Louisville, KY, for defendants.

## MEMORANDUM OPINION AND ORDER

COFFMAN, District Judge.

This matter is before the Court upon the motion of the defendants, Peabody Coal Company and Peabody Development Company (collectively "Peabody"), for summary judgment on Counts II and III of plaintiff's second amended complaint [Record No. 110]; motion of Peabody for summary judgment on Counts II and III of the plaintiff's third amended complaint [Record No. 178]; motion of Peabody for summary judgment on Counts IV, V, VI and VII of plaintiff's third amended complaint [Record No. 179]; and motion of Peabody for summary judgment on Counts II, III, IV, V, VI and VII of plaintiff's fourth amended complaint [Record No. 219]. The Court, having reviewed the memoranda and having heard the arguments of the parties, rules on Peabody's motions as detailed below.

## FACTUAL BACKGROUND [1]

In August, 1965, Jane McLeod Coil, Kate Coil Ballard, and S.T. Ballard ("Lessors"), entered into a Lease Agreement ("the Agreement") with Sentry Royalty Company ("Lessee"). Under the terms of the Agreement, the Lessors leased certain real estate located in Muhlenberg County, Kentucky, including the right to mine coal on this property, to the Lessee and its successors. In consideration for this lease, Lessee paid Lessors $1.00 and agreed to pay Lessors a royalty on each ton of coal mined and sold by the Lessee from the aforementioned property. The specific amount of royalty to be paid depended upon the method of mining employed by Lessee and was to be calculated on the "monthly average gross sales realization" ("MAGSR") from the coal. The Agreement defined "monthly average gross sales realization" as "the average price for a calendar month at which the coal is sold f.o.b. mine to the ultimate consumer or retail dealer without deduction of sales commissions or expenses or discounts."

The Agreement also allowed for deferment, discontinuance, and cancellation of mining operations. With regard to these events, the Agreement provided that Lessee would pay Lessors a specific predetermined amount. For example, if Lessee decided to defer mining operations for one year, Lessee would pay Lessors $1,800.00 on or before September 1. The Agreement also provided insurance that Lessors would receive the royalties due them. Under the terms of the Agreement, Lessors obtained a lien on the mining plant and equipment of Lessee as security for the payment of all royalties which would accrue under the terms of the lease.

Over the years, various taxes were imposed at both the state and federal level on the coal mining industry. For example, Kentucky levied a 4% severance tax on all persons engaged in the severance or processing of coal in 1972. The rate was increased in 1976, to 4½% of gross value of severed coal. In 1977, a federal reclamation tax was imposed on coal mine operators. Finally, in

---

1. So as to be consistent with regard to the factual background, this recitation draws heavily from the factual narratives within opinions earlier entered by the Court.

1978, a federal black lung tax was imposed on coal sold by the producer to help finance benefits for miners.

Peabody Coal Company succeeded Sentry, and thus assumed Sentry's rights and obligations under the Agreement. Peabody mined coal from the subject property and paid royalties. Peabody passed on the above-referenced taxes to its customers in the selling price of its coal. However, when calculating royalties to be paid on the coal it mined and sold, Peabody did not include the amounts billed to customers for the state and federal taxes when calculating gross realization. Thus, no royalties were paid on the portion of the gross selling price, as invoiced to the coal customer, attributable to the taxes.

The rights of the Lessors to receive payment of these royalties were devised to the plaintiff. The Johns Hopkins Hospital ("Johns Hopkins"). Thus, Johns Hopkins initiated the instant suit as the successor in interest to the original Lessors of the Agreement.

## PROCEDURAL BACKGROUND

Johns Hopkins originally filed its complaint in April, 1992, alleging breach of contract for underpayment of royalties (Count I) as well as fraud (Counts II and III) arising from the same conduct: failure to pay the correct amount of royalties. Prior to any responsive pleadings being filed, Johns Hopkins filed a first amended complaint. Peabody initially moved to dismiss the fraud claims. The Court, per Judge Charles Simpson, dismissed the fraud claims on August 31, 1993. On November 23, 1993, the Court granted summary judgment in favor of Johns Hopkins on the issue of liability on the breach of contract claim and subsequently ruled that Johns Hopkins can obtain all of its contract damages for royalty underpayments and that none of the contract claims are barred by the statute of limitations.

Johns Hopkins then sought leave to re-plead the fraud claims. The Court ruled that the claims could be re-filed and their legal sufficiency could be tested by a second motion to dismiss. Johns Hopkins filed a second amended complaint on December 22, 1993. Peabody's second motion to dismiss was filed on February 2, 1994. In a July 20, 1995 Order, the Court ruled that the fraud claims state a claim for relief under Fed. R.Civ.P. 12(b)(6).

Because Judge Simpson's Order of August 31, 1993 ruled that the fraud claims were insufficient on their face without resorting to material outside the pleadings, Peabody has filed a motion for summary judgment on Counts II and III of Johns Hopkins' second amended complaint. While Peabody's motion for summary judgment on Counts II and III of the second amended complaint was pending, Johns Hopkins sought and was granted leave to file third and fourth amended complaints. The third amended complaint was deemed filed on November 1, 1995 and the fourth amended complaint was deemed filed on January 9, 1996.

Peabody concedes that its motions as to the second and third amended complaints are moot. However, Counts II and III of the third and fourth amended complaints are essentially identical to those same counts in the second and third amended complaints. Therefore, the parties adopt and incorporate their memoranda pertaining to the second and third amended complaints into their memoranda on Peabody's motion for summary judgment on Counts II and III of the fourth amended complaint.

Similarly, on December 15, 1995, Peabody moved for summary judgment on Counts IV, V, VI and VII of Johns Hopkins' third amended complaint, which are virtually identical to the corresponding counts in the fourth amended complaint. In summary, these counts allege an entitlement to damages due to Peabody's receipt of $17.5 million pursuant to a buyout of a coal supply agreement and further allege that Peabody breached its implied duty to mine certain leased premises. Again, the parties adopt and incorporate their memoranda regarding the third amended complaint into their arguments on the defendant's motion for summary judgment on Counts IV–VII of the fourth amended complaint.

## DISCUSSION

### I. COUNTS II AND III:

In Counts II and III, Johns Hopkins alleges that Peabody fraudulently misrepresented or concealed its alleged underpayment of royalties and asks for an award of punitive damages. Peabody moves for summary judgment on Counts II and III because 1) Johns Hopkins did not, and as a matter of law could not, reasonably rely on Peabody to disclose the manner in which it calculated MAGSR under its lease with Johns Hopkins and 2) Johns Hopkins did not suffer any detriment as a result of Peabody's alleged failure to inform Johns Hopkins of Peabody's interpretation of the Agreement as excluding taxes from MAGSR.

■ The essential elements of actionable fraud are 1) a material misrepresentation; 2) which is false; 3) which was known to be false or made recklessly; 4) made with inducement to be acted upon; 5) which is acted on in reliance thereon; and 6) causes injury. *Compressed Gas Corp. v. United States Steel Corp.,* 857 F.2d 346, 349 (6th Cir.1988) (citing *Wahba v. Don Corlett Motors, Inc.,* 573 S.W.2d 357, 359 (Ky.Ct.App.1978)), *cert. denied,* 490 U.S. 1006, 109 S.Ct. 1641, 104 L.Ed.2d 156 (1989). Specifically, Peabody alleges that Johns Hopkins does not have sufficient evidence to prove the fifth and sixth elements—reliance and injury.

### A. Reliance

■ As to the reliance element, Peabody asserts that Johns Hopkins did not make any inquiry or audit of Peabody. Instead, John Hopkins hired a professional trust company, Liberty National Bank & Trust Company ("the Bank"), to act as its agent and to monitor and ensure the accuracy of the royalty payments. An agent for the Bank testified at deposition that 1) Peabody answered all questions about the Agreement; 2) it knew that other coal companies besides Peabody did not pay royalties on taxes; and 3) it never asked Peabody whether Peabody was paying royalties on taxes or advised Peabody that it believed the lease required it to do so. Under these facts, argues Peabody, Johns Hopkins cannot prove that it reasonably relied on Peabody to disclose to it or its agent, in the absence of any inquiry, that Peabody did not consider these taxes to be part of MAGSR.

In support of its reliance argument, Johns Hopkins provides that the record is undisputed that neither Johns Hopkins nor its agent, the Bank, knew Peabody was deducting taxes from gross sales realization in its calculation and payment of royalties to Johns Hopkins. Peabody sent monthly royalty statements to Johns Hopkins which indicated that the royalties being paid were the full amount due and owing under the Agreement, and Peabody sent realization adjustment reports to Johns Hopkins which indicated that the royalties were being calculated based upon the actual mine price. The evidence indicates that Johns Hopkins relied on these representations in accepting the royalty checks from Peabody. Thus, argues Johns Hopkins, there is sufficient evidence to support its allegation that it relied on Peabody's alleged misrepresentations and concealments.

The parties have not cited, and this Court has not found, a Kentucky case addressing reliance on misrepresentations concerning amounts due and owing in accepting payments. Other courts, however, have consistently held that the reliance element of actionable fraud is satisfied when a plaintiff accepts payments in reliance upon representations which intentionally understate the amount due. *Braswell v. ConAgra,* 936 F.2d 1169, 1174 (11th Cir.1991) (plaintiffs justifiably relied on the false weights because ConAgra exclusively controlled the weighing process and the plaintiffs accepted the inadequate payment in reliance on the false weights); *Morrill v. Becton, Dickinson and Co.,* 747 F.2d 1217, 1223–24 (8th Cir.1984) (there was sufficient evidence to support jury findings that Morrill relied on these misrepresentations in accepting the royalty payments); *L.C.L. Theatres, Inc. v. Columbia Pictures Industries,* 421 F.Supp. 1090, 1100 (N.D.Texas 1976) (on all contracts the acceptance by the distributors of the amounts actually paid was in reliance upon the representation that the tendered sums were the agreed-upon percentages).

■ Peabody asserts that Johns Hopkins did not have the right to rely on Peabody's misrepresentation and concealments because the lease contained an audit clause. As noted in the Court's July 19, 1995 Order, the audit clause allowed Johns Hopkins only to inspect Peabody's records relating to the amount of coal mined and sold from the leased premises. The audit clause did not give Johns Hopkins the right to audit Peabody's records concerning the gross sales realization for the coal mined and sold from the leased premises. Thus, the audit rights do not preclude Johns Hopkins from relying on Peabody's alleged misrepresentations and concealments. *See Morrill,* at 1223–24 (holding that "the opportunity for investigation will not of itself preclude the right of reliance because the trend in modern cases is to require less diligence rather than more, in persons to whom representations are made and to condemn the falsehood of the person making the representation, rather than the credulity of the victim").

Johns Hopkins' proof is that 1) Peabody consistently deducted taxes which were part of the selling price of the coal from gross sales realization in calculating and paying royalties to Johns Hopkins; 2) none of the royalty statements which Peabody sent to Johns Hopkins' agent, the Bank, gave any indication that Peabody was deducting taxes from gross sales realization in its calculation and payment of royalties to Johns Hopkins; and 3) Peabody periodically mailed price adjustments to the Bank which affirmatively misrepresented that the royalties were being paid upon the actual mine price of the coal. This evidence is enough to undergird a jury finding that Johns Hopkins relied upon Peabody's calculations.

### B. Injury

As to the injury element, Peabody makes these assertions: Johns Hopkins cannot prove that it suffered damage as a result of the alleged fraud. Johns Hopkins took no action to its detriment in reliance on Peabody's supposed misrepresentations, and was not otherwise damaged by Peabody's alleged failure to disclose information about its royalty calculations. Johns Hopkins' agents specifically testified that its only injury was receiving a lesser amount in royalties than it should have gotten—an injury caused solely by Peabody's breach of contract (a claim on which the Court has already granted partial summary judgment in favor of Johns Hopkins). That having been said, Peabody argues that Johns Hopkins has not proven the injury element of fraud.

In support of its injury argument, Johns Hopkins offers that its acceptance of inadequate royalty payments, alone, is sufficient to establish injury.

■ In *Morrill* the court sets out the elements of actionable fraud. It is important to note that the court states that one of the elements is detrimental reliance. In finding that Morrill proved the detrimental reliance element, the court implicitly found that Morrill's reliance, to his detriment, caused injury. Johns Hopkins, like Morrill, accepted inadequate royalty payments to its detriment. Acceptance of inadequate royalty payment establishes injury sufficient to meet the injury element of actionable fraud.

■ Additionally, Peabody asserts that Johns Hopkins did not "accept" the payments as that term is legally defined, i.e., as full satisfaction of Peabody's obligations under the Agreement. However, Peabody fails to cite any authority for this assertion. Nor do any of the above-cited cases dealing with acceptance of inadequate payments based on misrepresentations suggest that any such "defense" exists.[2]

■ Finally, Peabody emphasizes that Johns Hopkins, having received partial sum-

---

**2.** Kentucky also recognizes a claim for constructive fraud which arises through some breach of a legal duty which the law would pronounce fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests. *Wood v. Kirby,* 566 S.W.2d 751, 755 (Ky.1978). Fraud may also be established when the defendant is in a confidential or fiduciary relationship with the plaintiff and the defendant conceals or fails to disclose a material fact to the plaintiff. *Steelvest, Inc. v. Scansteel Service Ctr.,* 807 S.W.2d 476, 485 (Ky.1991).

Because the Court finds that Johns Hopkins has presented sufficient evidence to maintain a claim for actual fraud, constructive fraud will not be addressed.

mary judgment in its favor on its breach of contract claim, will be fully compensated for its loss· and as such there is no benefit to pursuing the fraud claim. Specifically, Peabody accuses Johns Hopkins of attempting to obtain punitive damages based on a simple breach of contract claim. However, it is clear that where the plaintiff does not seek to rescind a contract based upon fraud, but rather sues for breach of contract and fraud by the defendant in performing the contract, then both the contract and tort claims are proper for submission to the jury. *Braswell,* at 1173; *Morrill,* at 1222. Any problems with duplication of damages can be remedied through proper jury instructions. *See Braswell,* at 1173.

## II.   COUNTS IV, V, VI AND VII:

The relevant facts, presented in a light most favorable to Johns Hopkins, are as follows. Johns Hopkins has been bequeathed the lessors rights under. two lease agreements where Peabody has assumed the rights and obligations of the lessee. The two leases cover the same geographic area in Muhlenberg County, Kentucky, consisting of approximately 1,041 acres. The 1965 lease conveyed the right to mine the No. 9 seam of coal contained within the 1,041 acres. The 1944 Lease granted the right to mine the No. 11 and No. 12 seams of coal contained within the same acreage.

### A.   1965 Lease:

Under the express terms of the 1965 lease, Peabody received the right to mine and remove all of the No. 9 vein of coal in and underlying the leased premises by either the strip mining method or the underground method. The term of the 1965 lease was stated to be for a period of twenty years beginning September 1, 1965, and for so long thereafter as No. 9 coal was being produced from the leased premises.

The 1965 lease provides for earned royalties to be paid at· a royalty rate of ten cents per ton for the first $3.00 of the gross sales realization on underground mined coal, and four percent of the average gross sales realization in excess of $3.00 per ton. The earned royalty was to be paid on each and every ton of coal mined and removed and sold by the Lessee from the leased premises.

The 1965 lease also contains a provision permitting the lessee to pay a minimum advance royalty for the privilege of deferring or discontinuing mining operations on the 1965 leased premises. The lease recites that upon discontinuance of mining operations, the lessee shall pay to the. lessor a sum, which together with the royalty earned for that calendar year, shall equal $1,800.00, and that during discontinuance the lessee shall continue to make minimum royalty payments of $1,800.00 annually.

All sums. paid by the lessee, if any, for the deferment of the commencement of mining operations or for the discontinuance of mining operations are to be treated as minimum advance royalties and shall be credited against royalties thereafter due on coal mined and sold by the lessee.

For more than thirteen years after the 1965 lease was executed, Peabody did not conduct any mining from the 1965 leased premises. Peabody paid an annual advance minimum royalty of $1,800.00 per year to the lessors for each year from 1965 through 1978. In January, 1979, Peabody began underground mining on the No. 9 seam of coal. Before paying any earned royalties, however, Peabody credited itself ·for all of the advance royalties which had been paid between 1965 and 1978.· Peabody continued to mine on the No. 9 seam until June 1982, at which time mining was discontinued.

After Peabody discontinued mining in 1982, it paid an $1,800.00 advance royalty to Johns Hopkins in August of 1982, 1983 and 1984. Peabody resumed underground mining of the No. 9 seam of coal in January of 1985. Before paying any earned royalties to Johns Hopkins on the 1985 production, Peabody credited itself for all of. the minimum royalties which had been paid in 1982, 1983 and 1984. In March of 1988, Peabody sent to Johns Hopkins' agent its mining projections for coal production from the No. 9 seam for the years 1988, 1989 and 1990.

Prior to January 1, 1989, all of the coal which Peabody mined from the No. 9 seam was sold to Louisville Gas and Electric ("LG

& E") pursuant to a long-term coal supply agreement between LG & E and Peabody. However, there was no requirement that Peabody provide LG & E with coal from the areas leased under the 1944 or 1965 leases. In early 1989, Peabody and LG & E reached an agreement on the terms of an LG & E buyout of the existing coal supply agreement. The substance of the transaction was that Peabody agreed to release LG & E from the remaining two years of the LG & E coal supply agreement in exchange for LG & E's payment to Peabody of $17.5 million. In addition, Peabody and LG & E entered into two new coal supply agreements, with reduced tonnage requirements and, on one of the two agreements, at a substantially reduced selling price of coal. Peabody did not pay any royalties to Johns Hopkins on the $17.5 million, nor did it inform Johns Hopkins of the buyout payment received from LG & E.

By the end of July, 1989, Peabody ceased mining on the No. 9 seam. In August of 1989, Peabody gave Johns Hopkins notice of its intention to terminate the lease, effective October 1, 1989. Johns Hopkins became aware of the LG & E buyout in 1995.

### B. 1944 Lease:

On February 7, 1944, Hoyt Coil and his wife, Jane Coil, Johns Hopkins' predecessors in title, entered into a lease agreement with Sentry Coal Mining Company, predecessor to Peabody. Under the 1944 lease, the lessee was granted the right to mine all of the No. 11 and No. 12 seams of coal on the same 1,041 acre tract previously referenced for the 1965 lease. The 1944 lease was for a period of twenty years or until the lease was cancelled pursuant to other lease provisions, or until all of the minable and merchantable coal was mined. The lessee agreed to pay royalties based upon a specific percentage of the gross selling price above 35 cents per ton on each ton of coal mined from the premises. In the event that the lessee deferred the commencement of mining, or discontinued mining for a period of time, the lessee was required to pay a minimum advance royalty of $3,000.00 per year. After the commencement of mining operations, the lessee was permitted to recoup minimum advance royal-

ties which had been paid during that same calendar year.

In September, 1963, Peabody and the Coils executed two amendments to the lease, which extended the lease for an additional twenty-year period, and which also reduced the minimum advance royalties from $3,000.00 per year down to $1,200.00 per year.

Peabody commenced mining operations in the 1944 leased premises in 1957, and strip mined a substantial portion of the No. 11 and No. 12 seams of coal between 1957 and 1968. Peabody stopped mining the leased premises in 1968, and did not conduct any additional mining from the leased premises during the remaining fifteen years that the lease was in effect. During the period from 1969 through 1983, Peabody did continue to make minimum advance royalty payments in the amount of $1,200.00 per year. The lease expired by its own terms in February of 1984.

### C. Counts IV, V and VI:

■ In Counts IV, V and VI of the third and fourth amended complaints, Johns Hopkins alleges that it is entitled to a portion of the money paid to Peabody by LG & E for a buyout of the coal supply agreement with Peabody. Specifically, Count IV alleges that some unspecified portion of the LG & E buyout should have been included in the selling price of coal that was mined and sold by Peabody from the leased premises and that a royalty should have been paid to Johns Hopkins on that portion of the sum paid by LG & E to buy out the contract. Counts V and VI seek tort damages for the same conduct.

Peabody asserts that the buyout of the contract between Peabody and LG & E does not implicate the production of minerals and that by the express terms of the lease, Johns Hopkins is not entitled to a royalty on that buyout.

The lease agreement states that earned royalties are to be paid on each and every ton of coal mined and removed and sold by Peabody. There is nothing in the lease agreement obligating Peabody to pay royalties when it receives consideration for anything other than the severance of coal from Johns Hopkins' property.

The Fifth Circuit has rejected the very argument that Johns Hopkins makes here. In *Diamond Shamrock Exploration Co. v. Hodel*, 853 F.2d 1159, 1161 (5th Cir.1988), the court framed the issue as follows.

The issue raised is whether payments by a pipeline-purchaser to a lessee-producer of a federal oil and gas lease pursuant to a take-or-pay clause in its gas sales contract with the pipeline-purchaser are subject to payment of a royalty when the take-or-pay payment is received, not as value for gas actually taken, but as part of the take-or-pay obligation under the contract.... We agree with the lessee producers that royalty payments are not due on take-or-pay payments and are only due on gas actually produced or taken.

*Diamond Shamrock* resolved a conflict between two federal district courts in Louisiana.[3] In one of those cases, Mesa Petroleum Company ("Mesa") leased submerged, offshore lands from the United States pursuant to the Outer Continental Shelf Lands Act ("OCSLA"). Under the standard government oil and gas lease, Mesa was required to pay a royalty of 16⅔% in amount or value of production saved, removed or sold from the leased area. Mesa sold all of the gas produced from these federal leases to Tennessee Gas Pipeline Company ("Tennessee") under an exclusive long-term contract by which all of Mesa's production was committed to the contract with Tennessee.

The contract with Tennessee included a take-or-pay provision requiring Tennessee to take a specified amount of gas during each contract year or pay for that quantity even if not taken in full. Mesa periodically paid royalties to the United States through the Minerals Management Service ("MMS") of the Department of the Interior on all gas currently delivered to the pipeline. Mesa did not pay royalties on take-or-pay payments received from Tennessee. Royalties were calculated and paid only if, and only to the extent, make-up gas was taken.

After an audit, MMS ordered Mesa to pay royalties on the take-or-pay payments Mesa had received from Tennessee. Prior to the audit, Mesa had not paid royalties on the take-or-pay payments. Based on the audit, MMS notified Mesa that it owed MMS royalties on the take-or-pay payments with interest. Mesa appealed this order to the Director of the MMS who upheld the MMS' authority to collect royalties on the take-or-pay receipts. The Department of the Interior adopted the Director's decision as its final decision. Mesa appealed this order to the Western District of Louisiana.

The district court held that to the extent take-or-pay payments were made *in lieu* of taking gas, there was no production, and Mesa had no obligation to make royalty payments thereon. MMS was therefore without authority to collect royalties on such take-or-pay receipts. The government appealed to the circuit court.

A court within the Eastern District of Louisiana, faced with facts virtually identical to those in the *Mesa* case, reached the opposite conclusion. Diamond Shamrock, Cities Service, Exxon, Mobil and Texaco (and various subsidiaries) were lessees under numerous leases on the offshore Louisiana Outer Continental Shelf. These lessees uniformly failed to pay royalties on take-or-pay payments unless make-up gas had been taken in which case royalties were calculated and paid based on the price of the gas at the time the make-up gas was taken.

As in the *Mesa* case, the MMS ordered the lessee-producers to pay royalties on take-or-pay revenues received. The lessees appealed to the MMS Director, who affirmed the order.

Cities Service and Exxon had paid royalties on some, but not all, of their take-or-pay

3. Specifically, *Diamond Shamrock* is a consolidated case involving several lessee-producers of offshore lands of the United States. These lessee-producers include Mesa Petroleum Company, Diamond Shamrock, Cities Service, Exxon, Mobil and Texaco (and various subsidiaries). The United States District Court for the Western District of Louisiana, at Lake Charles, *Mesa Petrole-um Co. v. U.S. Dept. of Interior,* 647 F.Supp. 1350 (W.D.La.1986), ordered that Mesa was not required to pay the lessor-government royalties on take-or-pay payments. A conflicting judgment was entered, as to the remaining lessee-producers, in the United States District Court for the Eastern District of Louisiana, at New Orleans. Consolidated appeals were taken.

revenues. Those two companies requested refunds for royalties paid on such take-or-pay revenues. The MMS denied the request. Cities Service and Exxon appealed the denial of their requests to the MMS Director. The Director affirmed the denial.

The district court treated take-or-pay payments as the equivalent of advance payments for gas and held that the take-or-pay payments were to be taken into account in calculating the "value" of the production removed and were subject to royalty. The district judge sustained the Department of the Interior's decisions and expressly rejected the holding of the Western District in *Mesa*. The lessee-producers appealed.

The Fifth Circuit, in resolving an appeal from these consolidated cases, held as follows:

> It is obvious from a complete reading of all the relevant statutes, regulations and lease provisions, that royalties were not due on 'value' or even 'market value' in the abstract, but only on the value of *production saved, removed or sold* from the leased property. Likewise the agency's regulations do not refer to 'gross proceeds' in the abstract, but only to gross proceeds that accrue to the lessee from the disposition or sale of *produced substances,* that is, gas actually removed and delivered to the pipeline. Consequently, royalties are not owed unless and until actual production, the severance of minerals from the formation, occurs.

*Diamond Shamrock,* at 1165 (emphasis in original).

The Fifth Circuit discussed the purpose and consequences of a take-or-pay clause.

> While the take-or-pay obligation is intended to compensate the producer for the exclusive commitment of reserves to a gas sales contract, this does not automatically mean that the take-or-pay obligation is part of the value of the gas. A take-or-pay payment which comes before gas is actually produced and taken simply cannot be a payment for the sale of gas.
>
> > The purpose of a take-or-pay clause is to apportion the risks of natural gas production and sales between the buyer and seller. The seller bears the risk of production. To compensate the seller for that risk, buyer agrees to take, or pay for if not taken, a minimum quantity of gas. The buyer bears the risk of market demand. The take-or-pay clause insures that if the demand for gas goes down, seller will still receive the price for the contract quantity delivered each year.
>
> Take-or-pay payments are not, therefore, payments for the sale of gas. Far from being payments for the purchase of gas, take-or-pay payments are payment for the pipeline-purchaser's failure to purchase gas. The DOI ("Department of the Interior") asserts, and Judge Sear accepts this assertion, that a take-or-pay payment is a benefit attributable, at least in part, to the government's interest. We cannot agree. Take-or-pay payments are intended to compensate primarily the producer, not the owner of the minerals, for the risks associated with development production.

*Diamond Shamrock,* at 1167 (quoting *Universal Resources Corp. v. Panhandle Eastern Pipe Line Co.,* 813 F.2d 77, 80 (5th Cir.1987)).

Relying on *Diamond Shamrock,* another District Court within the Eastern District of Kentucky recently rejected a lessor's claim for royalty payments on a contract settlement payment. In *In re Century Offshore Management Corp.,* 185 B.R. 734 (E.D.Ky. 1995), the court ruled that Century was not obligated to pay the federal Minerals Management Service ("MMS") a royalty on the settlement payment.

The facts of *Century* are strikingly similar to the facts herein. MMS leased natural gas properties to Century. Century's lease called for MMS to receive a fixed percentage of the amount or value of the production saved, removed or sold from the premises. Century signed several purchase contracts with Enron Gas Marketing, Inc. ("Enron") in which Enron agreed to purchase minimum quantities of gas produced by Century specifically from the MMS properties. After a decline in the market price of natural gas, Enron offered to buy out these natural gas contracts between Century and Enron for a

lump-sum payment of $12.25 million. Century accepted the offer and relieved Enron of its contractual obligation to purchase natural gas from Century. Century did not pay royalties to MMS on the money it received from Enron.

The *Century* court found that Enron's lump-sum payment to Century was intended to terminate Enron's future obligations under the gas purchase contracts and was not in payment for present or future deliveries of severed natural gas. Additionally, the court held that royalties were due only where there had been production, meaning severance of minerals from the producing underground formation. The *Century* court held that no royalties were due even though Century's contract with Enron specified that the minerals supplied to satisfy the contract must come from MMS' property.

Finally, the *Century* court noted it would be unfair if the lessor could claim a portion of a contractual buyout while at the same time retaining the minerals that could be sold or leased at a later date. Such a situation would necessitate two royalty payments on the same mineral.

In the instant case, as noted previously, royalties were to be paid on all coal mined and removed and sold by Peabody. No other event required Peabody to pay royalties, in the absence of severance of coal from Johns Hopkins' property. This case thus fits squarely within the facts in *Diamond Shamrock* and *Century.* Here, as in those cases, royalties were owed only in the event that actual production—that is, the severance of coal—occurred.

In addition, Peabody was not contractually obligated to sell Johns Hopkins' coal to LG & E, but could supply coal to LG & E from another source if it so elected. After LG & E bought out its contract with Peabody, Johns Hopkins retained its coal in place and could later collect royalties upon the coal, should the market improve so as to make its production feasible and profitable. If Johns Hopkins were permitted to obtain a royalty on some portion of the LG & E settlement

payment as well, it would benefit doubly: once upon the severance of coal and once in the absence of such an event.

The contractual settlement payment here at issue was not in payment for either present or future production of coal. Rather, LG & E's $17.5 million lump-sum payment to Peabody was a payment made with the express understanding that no future coal would be produced for the purpose of sale to LG & E. The settlement payment thus did not represent the only event which could trigger Peabody's payment of a royalty to Johns Hopkins—namely, the severance of coal from the premises leased by Johns Hopkins to Peabody.

Johns Hopkins argues that royalties are due on the buyout amount and that *Century* is inapplicable. First, Johns Hopkins, citing *Frey v. Amoco Production Co.,* 603 So.2d 166 (La.1992) and *Klein v. Jones,* 980 F.2d 521 (8th Cir.1992), asserts that a lessee breaches its fiduciary duty where it enters into an agreement allowing itself to receive a lump sum of money and at the same time causing the selling price of the minerals to decrease. *Frey* and *Klein,* however, are distinguishable from the instant action because the lease agreements in *Frey* and *Klein* entitled the lessors to a royalty on the amount realized from sales, whether or not there was actually any production.[4]

Additionally, Johns Hopkins argues that *Century* did not involve the substantive law of Kentucky. Rather, the issue was whether MMS, which was the lessor under certain oil and gas leases issued pursuant to the OCS-LA, was entitled to receive a statutory royalty on a take-or-pay clause. However, the statutory royalty provision is remarkably similar to the royalty clause herein. Therefore, an analysis of the statutory royalty provision is persuasive in a case with a similar royalty clause.

Again, relying on *Frey,* Johns Hopkins asserts that *Diamond Shamrock* is inapplicable because later Fifth Circuit cases have specifically declined to follow it. The Court

---

4. In *Frey,* the Fifth Circuit noted that the royalty clause was not like the contract in *Diamond Shamrock* because it entitled the lessor to a royalty on the amount realized from sales, not on production.

disagrees. Later cases in that circuit have declined to follow *Diamond Shamrock* only where the royalty payment was not production-based or where the case was otherwise factually distinguishable from *Diamond Shamrock*.[5]

This Court finds persuasive the reasoning of *Diamond Shamrock* and *Century*. Those cases present facts comparable to the ones in the present case, in that the lease agreement is production-based and creates no entitlement to royalty payments based on sales.

### D. Count VII:

■ Count VII of the third and fourth amended complaints alleges that Peabody breached an implied duty to mine all of the merchantable, commercially minable and economically recoverable coal in the leased premises.

Peabody's defense to Johns Hopkins' implied covenant claims is that the existence of a minimum royalty provision in the 1965 and 1944 lease agreements operates to negate the implied covenant of diligent mining.

Peabody, while acknowledging that under some circumstances an implied covenant of diligent mining does exist, asserts that Count VII is fatally defective for the following reasons: 1) Johns Hopkins cannot enforce an implied covenant that contradicts the express terms of the leases;[6] 2) Johns Hopkins made no demand on Peabody to continue mining; 3) Johns Hopkins has waived its right to enforce an implied obligation, assuming *arguendo* that one exists, because it accepted the minimum advance royalties in lieu of earned royalties; and 4) the implied covenant claim is barred by the applicable statute of limitations.

From a review of the cases cited by the parties, the Court notes a conflict in Kentucky law regarding the implied covenant of diligent mining. However, *Cameron v. Lebow*, 338 S.W.2d 399, 403, 405 (Ky.1960), rev'd on other grounds, 394 S.W.2d 773 (Ky.

1965), recites thoroughly the history and status of the implied covenant of diligent mining, before concluding:

Let us now recapitulate the implied obligations of the lessee with respect to development as set forth in the foregoing cases. Those obligations are: (1) where delay rental is provided in the lease, to commence or increase development after notice and demand; (2) where no delay rental is provided, to begin or continue operations within a reasonable time; (3) where productive operation has been commenced, to continue that operation. . . .

There is consequently no authority for adjudging that a lessee . . . has an implied obligation to begin operations on a particular part of the leasehold . . . without notice and demand from the lessor to so proceed. . . .

.       .       .       .       .

Under Kentucky law, as we have said, this obligation (obligation to develop) does not exist independently of notice.

■ From *Cameron* it is clear that an implied obligation of diligent mining does not exist 1) if the lessor fails to give the lessee notice and 2) if the lease agreement provides for minimum advance royalties. Johns Hopkins failed to give Peabody notice that it wanted Peabody to develop the mined premises. Additionally, Johns Hopkins continued to accept the advance royalty payments in lieu of earned royalties.

Johns Hopkins states that Kentucky courts have consistently recognized that in the conveyances of mineral rights, including leases, there is imposed upon the lessee an implied obligation to diligently mine the coal within the leased premises. *Killebrew v. Murray*, 151 Ky. 345, 151 S.W. 662 (1912); *Cawood v. Hall Land & Mining Co.*, 293 Ky. 23, 168 S.W.2d 366 (1943). Additionally, Johns Hopkins asserts that Kentucky courts have also

---

**5.** The concurrence in *Frey* specifically states that the court is not attempting to overrule *Diamond Shamrock*, whose outcome was dependent upon a standard production-type royalty clause.

**6.** More specifically, Peabody asserts that there is no implied covenant of development where, as is

the case here, a mineral lease provides for the payment of minimum royalties as compensation for any period of time in which no mining occurs. *Continental Fuel Co. v. Haden*, 182 Ky. 8, 206 S.W. 8, 10 (1918).

held that the payment of a nominal minimum royalty does not defeat the implied covenant of diligent mining, particularly where the advance royalty is to be credited against future production royalties. *Killebrew*, 151 S.W. at 664; *Monarch Oil, Gas & Coal Co. v. Richardson*, 124 Ky. 602, 99 S.W. 668, 669.

As to the notion of an implied duty to mine diligently, Peabody does not protest. It urges, correctly, that this case presents one of the exceptions to such a duty. With regard to Johns Hopkins' latter point about the payment of a minimum royalty, the cases cited by Johns Hopkins, when read closely, actually support Peabody's position. In *Killebrew*, which has been overruled by *Union Gas & Oil Co. v. Wiedemann Oil Co.*, 211 Ky. 361, 277 S.W. 323, 330 (1925), the lessor accepted only one of the advance royalty payments. All advance royalty payments tendered after the first payment were rejected by the lessor because of lessee's failure to begin work under the lease. Johns Hopkins, in contrast, accepted each and every advance royalty payment tendered by Peabody.

In *Monarch*, the court held that the lessor was entitled to forfeit the lease for a failure to develop the premises, but could not do so until he had first declined to accept the rent, i.e., advance royalty payments, and demanded that the lessee develop the premises. Again, Johns Hopkins neither declined advance royalty payments nor demanded that Peabody develop the leased premises.

Finally, Johns Hopkins argues that it is seeking only damages and not forfeiture or cancellation of the lease, which distinguishes this case from those cited by Peabody. It is true that in the vast majority of the cases dealing with breach of an implied covenant to mine diligently, the lessor is seeking cancellation or forfeiture. However, Johns Hopkins does not cite, nor can the Court find, any authority for the position that notice is required only if the lessor seeks to cancel the lease rather than to collect damages. Addi-

tionally, in *Lafitte Co. v. United Fuel Gas Co.*, 177 F.Supp. 52, 65 (E.D.Ky.1959), the court ruled that a demand is necessary where the lessor was seeking damages—additional royalties.[7]

Johns Hopkins' continued acceptance of advance royalty payments and its failure to demand that Peabody begin development of the leased premises are fatal to its breach of the implied covenant of diligent mining claim.[8]

Accordingly, **IT IS ORDERED** that Peabody's motion for summary judgment on Counts II and III of the second amended complaint [Record No. 110] is DENIED AS MOOT.

**IT IS FURTHER ORDERED** that Peabody's motion for summary judgment on Counts II and III of the third amended complaint [Record No. 178] is DENIED.

**IT IS FURTHER ORDERED** that Peabody's motion for summary judgment on Counts IV, V, VI and VII of the third amended complaint [Record No. 179] is DENIED AS MOOT.

**IT IS FURTHER ORDERED** that Peabody's motion for summary judgment on Counts IV, V, VI and VII of the fourth amended complaint [Record No. 219] is GRANTED.

**IT IS FURTHER ORDERED** that Peabody's motion to quash the trial subpoena directed to Andalex Resources is DENIED AS MOOT, in light of the Court's granting summary judgment with regard to Count VII of the third and fourth amended complaints.

---

7. Johns Hopkins suggests that this statement is not binding because it was *obiter dictum*. However, the court expressly held that failure to give notice was an independent basis for dismissing the implied covenant claim.

8. As the Court has determined that continued acceptance of advance royalty payments and failure to make demand on Peabody destroys Johns Hopkins' cause of action, the Court declines to address Peabody's remaining assertion that Johns Hopkins' claim cannot be enforced because it is barred by the statute of limitation.