**Jesse T. VINSON, Sr, Plaintiff–Appellant,**

v.

**FORD MOTOR CREDIT CORPORA-TION, a Delaware Corporation Defendant–Appellee.**

No. 02–5018.

United States Court of Appeals, Sixth Circuit.

Jan. 23, 2003.

Before MOORE and COLE, Circuit Judges; and SARGUS, District Judge.*

## OPINION

COLE, Circuit Judge.

Plaintiff–Appellant Jesse T. Vinson, Sr. appeals the Memorandum Opinion and Order of the United States District Court for the Western District of Kentucky, Owensboro Division, granting summary judgment in favor of Defendant–Appellee Ford Motor Credit Corporation ("Ford"). Vinson owned and operated Twin Rivers Ford–Mercury Inc., a Ford and Mercury automobile dealership. Vinson entered into a financing agreement with Ford in order to purchase vehicles for the dealership, and this agreement gave Ford a priority security interest in the assets of Twin Rivers. Twin Rivers failed to pay a portion of its federal taxes in 1995 and 1996, which resulted in the Internal Revenue Service ("IRS") filing a tax lien on the assets of the dealership. Because this lien was superior to Ford's security interest, Ford suspended Vinson's financing agreement. The IRS eventually drafted an agreement to subordinate its lien, but Ford refused to sign that subordination agreement or to reinstate the financing agreement. Vinson argues that Ford: (1) breached its fiduciary duty; (2) committed fraud and misrepresentation; and (3) breached an oral contract when it refused to reinstate the financing agreement.

For the reasons that follow, we **AFFIRM** the district court's grant of summary judgment.

## I. BACKGROUND

Vinson was the president, general manager and sole shareholder of Twin Rivers Ford–Mercury car dealership ("Twin Rivers") in Leitchfield, Kentucky. On January 14, 1994, Vinson and Ford entered into an Automotive Wholesale Financing Plan and Security Agreement, which is commonly referred to as a "floor plan." Under this agreement, Ford extended Vinson a line of credit to finance the purchase of new and used cars, and other merchandise and inventory for sale by the dealership. As collateral for the line of credit. Ford took a purchase-money security interest in vehicles, parts, accessories, other inventory, accounts, contract rights, chattel paper and general intangibles owned, acquired or used by Twin Rivers. This perfected security interest gave Ford a first lien on the aforementioned collateral. Vinson also entered into a Kentucky Continuing Guaranty Agreement with Ford on April 5, 1995. This agreement guaranteed payment of Twin Rivers' outstanding indebtedness to Ford incurred as a result of the floor plan and held Vinson personally responsible for such payment.

According to Vinson, the office manager at Twin Rivers, Martha Brown, failed to transmit employee withholding tax payments to the IRS on behalf of the dealership in 1995 and 1996. Vinson avers that Brown created false documents regarding such payments and then embezzled the funds that should have been forwarded to the IRS; however, Brown was never prosecuted or charged with any criminal activi-

---

* The Honorable Edmund A. Sargus. Jr., United States District Judge for the Southern District of Ohio, sitting by designation.

ty. On September 11, 1996, Roy Wyatt, an IRS Revenue Officer, met with Vinson to discuss the tax deficiency, and subsequently filed on behalf of the IRS a tax lien on all the property of Twin Rivers for $235,147.31 in unpaid taxes. Initially the lien was second in priority to Ford's lien. However, in accordance with federal law, the IRS lien was granted priority over the lien of Ford forty-five days after filing of the lien as to vehicles, merchandise and inventory that came into the dealership's possession after that date. 26 U.S.C.A. § 6323 (2002). Ford received a Notice of Federal Tax Lien from the IRS on December 11, 1996, after confirming with its legal counsel that the IRS indeed had a superior lien. Ford suspended Twin Rivers' floor plan on December 12, 1996. Ford, through Terry Mattingly, its branch manager in Henderson, Kentucky, advised Twin Rivers that the plan would not be reinstated unless the IRS lifted its lien. Mattingly confirmed the filing of the lien in a January 7, 1997 letter to Vinson.

Twin Rivers was also in default of its interest payments on the floor plan by approximately $20,000 to $25,000. At some time after Mattingly's letter to Vinson, Ford informed Vinson that, in addition to the IRS subordinating its lien, he also needed to bring his interest account current before Ford would consider reinstating the floor plan.

As a result of Ford's suspension of its floor plan. Twin Rivers filed for protection under Chapter 11 of the Bankruptcy Code on January 10, 1997. Scott Bachert, Twin Rivers' bankruptcy attorney, contacted Mattingly and James Earhart the Assistant U.S. Attorney representing the IRS in the bankruptcy proceedings, in an attempt to negotiate an agreement regarding the conflicting priority of liens between the IRS and Ford. The goal, according to Bachert, was to have the IRS subordinate

its lien so that Ford would reinstate the floor plan. Following negotiations among Bachert, Earhart, and Charles Friedman, counsel for Ford, Earhart drafted a proposed "Agreed Order" in early 1997 for signature by the affected parties and entry with the Bankruptcy Court presiding over Twin Rivers's Chapter 11 proceedings. In that proposed order, the IRS would agree to subordinate its lien on certain inventory, parts and accounts receivable. The agreement also noted that there were some vehicles in the Twin Rivers inventory for which a priority of liens had not been established, and the IRS and Ford reserved determination of the priority of liens as to those vehicles for a later time. Finally, under the proposed order, the IRS would agree to subordinate its lien on any additional automobile and parts inventory delivered to Twin Rivers, and any accounts receivables derived from such inventory. On April 18, 1997, Earhart prepared a Status Report for the Bankruptcy Court, stating that the proposed order had been prepared and circulated and that he was awaiting signature by the parties. Although the IRS and Twin Rivers agreed to sign the order, Ford ultimately refused to sign it or to reinstate the floor plan. On May 13, 1997, Twin Rivers's Chapter 11 case was converted to a liquidation proceeding under Chapter 7 of the bankruptcy laws, and the dealership's assets were liquidated. On December 30, 1997, Vinson and his wife, Wanda, filed personally for bankruptcy protection after Ford made demand upon them for the payment of the remaining balance owed under the floor plan.

## II. DISCUSSION

This Court reviews the district court's grant of summary judgment *de novo*. *See Watkins v. Battle Creek*, 273 F.3d 682, 685 (6th Cir.2001). Summary judgment should

be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). Summary judgment is appropriate if a party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding a motion for summary judgment, the court must view the factual evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmoving party must set forth specific facts showing that there is a genuine issue for trial. A genuine issue for trial exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby,* Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## A. Breach of fiduciary duty

On appeal, Vinson makes a general argument that the district court erred in granting Ford's motion for summary judgment, but does not directly address the issue of any alleged breach of a fiduciary duty by Ford. In his Verified Complaint, Vinson claimed that Ford breached its fiduciary duty to him to deal fairly and in good faith. He asserted therein that Twin Rivers and Ford had a fiduciary relationship because Ford dominated and controlled the dealership through the floor plan.

As the district court notes, in Kentucky, a fiduciary relationship is "one founded on trust or confidence reposed by one person in the integrity and fidelity of another and which also necessarily involves an undertaking in which a duty is created in one person to act primarily for another's benefit in matters connected with such undertaking." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.,* 807 S.W.2d 476, 485 (Ky.1991). Twin Rivers's floor plan was a contractual agreement which provided financing to purchase vehicles and other inventory for his dealership. Though Ford took a broad security interest in the assets of the dealership as part of the agreement, there is no evidence to support a finding that Ford dominated or controlled the actual operation such that a fiduciary relationship arose. *See In re Sallee,* 286 F.3d 878. 893 (6th Cir.2002) ("Fiduciary relationships can be informal, but they must evidence circumstances showing both parties agreed that one party would be acting in the interest of the other.") The execution of the floor plan itself did not create a relationship of trust or confidence between Vinson and Ford, rather the floor plan agreement simply created a typical creditor-debtor relationship. *See, e.g. General Motors Corp. v. Bell,* 714 So.2d 268, 280 (Ala.1996) ("In the absence of special circumstances ... no fiduciary or confidential relationship exists between a creditor and a debtor."). The floor plan executed by Vinson and Ford was a standard financing agreement between an authorized dealership and an automobile manufacturer. These types of agreements are commonplace in the automobile industry and provide dealerships with the capital to purchase automobiles for their businesses. However, Twin Rivers's floor plan, did not, without more, create a duty in Ford to act primarily on behalf of Vinson or Twin Rivers. The floor plan was an arm's-length contract negotiated between Twin Rivers and Ford and understood to be a standard financing agreement. Indeed, Vinson testified in his

deposition that he had thirty years of experience in automotive sales and that he owned two other dealerships in Texas. Clearly he was familiar with floor plan agreements and his rights and responsibilities thereunder. The execution of the floor plan did not create a fiduciary relationship between Twin Rivers and Ford, and thus summary judgment was properly granted to Ford on this issue.

### B.  Fraud and misrepresentation

Vinson claims that Mattingly made material false misrepresentations to him at a September 13, 1996 meeting and in a January 7, 1997 letter. Vinson claims that in both the meeting and the letter Mattingly informed him that Ford would reinstate his floor plan if the IRS agreed to subordinate its lien. He argues that Mattingly's representations were false because Ford did not reinstate the floor plan.

■ In Kentucky, actionable fraud and misrepresentation requires a plaintiff to establish six elements; (1) a material misrepresentation; (2) which is false; (3) which is known to be false or made recklessly; (4) made with inducement to be acted upon; (5) which is acted on in reliance thereon; and (6) which causes injury. *Johns Hopkins Hosp. v. Peabody Coal Co.*, 920 F.Supp. 738, 742 (W.D.Ky., 1996) (citations omitted). As a preliminary factual issue, though it is not clear what representations Mattingly made to Vinson during their September 13th meeting, it is clear that Mattingly stated in his January 7th letter that "[y]our credit lines will remain suspended until such time as the [IRS] Lien/Levy is lifted." Putting aside the alleged oral representation by Mattingly, we examine the representations made in the January 7th letter as to whether they give rise to claims of fraud and misrepresentation. With regard to that letter, Vinson has failed to establish the elements

necessary to make out a claim of fraud. *See Sanford Constr. Co. v. S & H Contractors, Inc.* 443 S.W.2d 227, 235 (Ky.1969) ("Our rule is that '(t)he burden is on the party asserting fraud to establish it by clear and convincing proof.') (citations omitted). Although Vinson fails to meet any of the prongs of a prima facie case of fraud, it is most notable that he fails to establish that Mattingly's representation in the January 7 letter was false. Mattingly conveyed to Vinson that reinstatement of his plan would be conditioned on the subordination of the IRS lien. The record is devoid of any agreement between Ford and the IRS to subordinate the federal tax lien. Earhart's report to the Bankruptcy Court simply stated that "the United States anticipates that the Agreed Order will be signed and filed with the Court during the week of April 21, 1997." However, the Agreed Order never became final because Ford decline to execute it. Earhart's mere preparation of the order and submission of the Status Report do not satisfy the contingency that the IRS actually subordinate its lien. Ford was under no obligation to reinstate the floor plan absent the subordination. Accordingly, Vinson is unable to establish a case of actionable fraud and misrepresentation, and summary judgment was proper.

### C.  Breach of contract

Vinson also argues that Mattingly's representations and his subsequent reliance on those representations constituted an enforceable oral contract. In particular, Vinson claims that after Bachert informed him that the IRS allegedly agreed to subordinate its lien, he invested an additional $65,000 in the dealership, and rejected several offers to sell the dealership in reliance on Ford's promise to reinstate the floor plan.

Such an oral promise is covered under the Kentucky Statute of Frauds as an agreement to renew credit. The Kentucky statute states in relevant part:

No action shall be brought to charge any person upon any promise, contract, agreement, undertaking, or commitment to loan money, to grant, extend, or renew credit, or make any financial accommodation to establish or assist a business enterprise or an existing business enterprise ... unless the promise, contract, agreement, representation ... be in writing and signed by the party to be charged therewith, or by his authorized agent.

KRS 371.010(9) (2002). The district court noted, and Ford argues, that under Kentucky law Mattingly's promise is unenforceable unless it is in writing. But Mattingly's oral promise to reinstate the floor plan arguably *was* reduced to writing in his letter of January 7, 1997. Therefore, Vinson's argument appears not to be that there was a valid oral contract, but that there existed a valid written contract that satisfied the Statute of Frauds, and that contained a condition precedent. Even if Mattingly's letter constituted a valid contract between Vinson and Ford, however, that contract never was breached since the IRS never subordinated its lien. Although the district court was persuaded by the fact that no breach occurred because the IRS had agreed to subordinate part, but not all, of its lien, the dispositive fact is that the proposed order was never signed by all parties. *See Computer Consulting & Network Design. Inc. v. IBM*, 184 F.Supp.2d 618, 621 (W.D.Ky.2002) (holding that even if a valid contract existed because of email and other communications between the parties, it was unenforceable without the occurrence of the condition precedent). Without satisfaction of the condition that the IRS subordinate its lien, Ford was under no obligation to reinstate

the floor plan regardless of the specific provisions of the proposed order. Therefore, Vinson has failed to present evidence to establish that a genuine issue of material fact exists with regard to his breach of contract claim.

### D. Additional Discovery

In his final argument on appeal, Vinson contends that he "simply did not have sufficient time or opportunity for discovery." Specifically, he claims that he did not have time to depose and redepose several individuals and obtain various documents from Ford before the district court granted Ford's motion for summary judgment. Vinson's argument fails.

It is well-settled that before ruling on a motion for summary judgment, a district court must afford the parties adequate time for discovery. *White's Landing Fisheries, Inc. v. Buchholzer*, 29 F.3d 229, 231–232 (6th Cir.1994) ("a grant of summary judgment is improper if the non-movant is given an insufficient opportunity for discovery") (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Generally, however, this Court does not review such claims when they are presented for the first time on appeal. *See Taft Broadcasting Co. v. United States*, 929 F.2d 240, 243 (6th Cir. 1991) ("issues not litigated in the trial court are generally not appropriate for appellate consideration in the first instance"); *see also Roush v. KFC Nat'l Mmgt Co.*, 10 F.3d 392, 397 (6th Cir.1993) (considering whether district court had opportunity to rule on issue being appealed). Before seeking appellate review, the parties should give the district court a chance to address their need for further discovery prior to the grant of summary judgment. *Plott v. Gen. Motors Corp., Packard Elec.*

*Div.,* 71 F.3d 1190, 1195 –1197 (6th Cir. 1995). In order to preserve an argument that the grant of summary judgment precluded necessary discovery, the nonmoving party must comply with Federal Rule of Civil Procedure 56(f). That rule reads in relevant part:

> (f) When Affidavits are Unavailable. Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

If the appellant has not filed either a Rule 56(f) affidavit or a motion that gives the district court an opportunity to rule on a request for additional discovery, this Court generally will not address the question of whether there was adequate time for discovery. *See Klepper v. First Am. Bank,* 916 F.2d 337, 343 (6th Cir.1990) (affirming summary judgment despite insufficient discovery opportunity where appellant never filed Rule 56(f) affidavit); *Emmons v. McLaughlin,* 874 F.2d 351, 356–57 (6th Cir.1989) (affirming summary judgment due to lack of adequate Rule 56(f) affidavit).

The record is devoid of evidence that Vinson filed either a Rule 56(f) affidavit or made any motion for additional discovery prior to the entry of summary judgment. Furthermore, in his Motion to Vacate. Alter or Amend filed on October 15, 2001. Vinson failed to raise any argument regarding madequate time for discovery. Accordingly, because Vinson has not pre-

served the issue, it is not properly before us.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the grant of summary judgment by the district court.