The gas lease in this case expressly required Hunt to report its "gross proceeds" and to pay royalties equal to 25% of those "gross proceeds" to the State Lands Division of the Department of Conservation and Natural Resources. The record contains clear and convincing, although disputed, evidence that Hunt intentionally reported as the "gross proceeds" identified by the lease what Hunt knew to be net proceeds — net of deductions forbidden by the lease — and that Hunt intentionally underpaid the royalties by calculating them as 25% of such lower net proceeds instead of the greater "gross proceeds." The evidence in the case also proves that Hunt underreported the volumes of gas produced and thereby further underpaid the royalties due the State.
The dispositive issue, as identified by the main opinion, is whether the record contains substantial evidence that the State relied to its detriment on the reports and underpayments. On the rationale that the record does not contain such substantial evidence, the main opinion reverses the judgment in favor of the State. I *Page 24 
respectfully submit that the record does contain evidence of reliance which is substantial under the applicable standard of review. Therefore, I respectfully dissent.
 "A trial court deciding a motion for [judgment as a matter of law] and an appellate court reviewing such a ruling must accept the tendencies of the evidence most favorable to the nonmovant, Wal-Mart Stores, Inc. v. Manning, 788 So.2d 116 (Ala. 2000), Southern Energy Homes, Inc. v. Washington, 774 So.2d 505 (Ala. 2000), and Palm Harbor Homes[, Inc. v. Crawford], [689 So.2d 3 (Ala. 1997)], and must resolve all reasonable factual doubts in favor of the nonmovant, Willis v. Parker, 814 So.2d 857 (Ala. 2001)."
Ex parte Helms, 873 So.2d 1139, 1144 (Ala. 2003). See Hathcockv. Wood, 815 So.2d 502, 506 (Ala. 2001) (the judgment-as-a-matter-of-law standard of review is indistinguishable from the summary judgment standard of review).
 "[I]n cases of intentional or aggravated acts there is an extended liability and the rules of proximate causation are more liberally applied than would be justified in negligence cases. This is especially true in cases of fraud where proximate cause is often articulated as a requirement of reasonable reliance where but for the misrepresentation or concealment it is likely the plaintiff would not have acted in the transaction in question. In those instances where the defendant is found to have acted intentionally it is proper that a more remote causation result in liability than would be true in negligence cases.
The policy to be followed is that liability should fall on the wrongdoer rather than to permit the victim to go uncompensated."
Shades Ridge Holding Co. v. Cobbs, Allen Hall Mortgage Co.,390 So.2d 601, 607 (Ala. 1980) (emphasis added).
 "`Fraud, in the nature of it, implies that the party has been misled and that, by the wrong of another, he is accepting and resting in a false sense of security. A party thus situated is not required to presume fraud or suspect it, until something comes to him leading a just person to suspect and make inquiry.'"
Johnson v. Shenandoah Life Ins. Co., 291 Ala. 389, 396,281 So.2d 636, 642 (1973) (quoting Williams v. Bedenbaugh,215 Ala. 200, 204, 110 So. 286, 289 (1926)). Accord Earle, McMillan Niemeyer v. Dekle, 418 So.2d 97, 100 (Ala. 1982), and Holemanv. Quick, 246 Ala. 659, 662, 21 So.2d 839, 841 (1945).
In Braswell v. ConAgra, Inc., 936 F.2d 1169, 1174 (11th Cir. 1991), the United States Court of Appeals for the Eleventh Circuit, applying Alabama law, held that the plaintiffs had established the reliance element of their fraud claim by proving that "ConAgra exclusively controlled the weighing process, and . . . the plaintiffs accepted the inadequate payment in reliance on the false weights." While the Braswell court refers to the reliance element of a fraud action as justifiable reliance, consistently with the standard for this element at the time of that decision, instead of the reasonable reliance that is the corresponding element of the fraud claims by the State in the case now before us, Foremost Ins. Co. v. Parham, 693 So.2d 409
(Ala. 1997), Braswell does not depend on the distinction between justifiable reliance and reasonable reliance. The issue in Braswell was not the justifiability or the reasonableness of the plaintiffs' reliance. That is, the issue was not the degree of care exercised by the plaintiffs for their own protection against fraud. Rather, the issue was whether acceptance of an *Page 25 
underpayment constituted a sufficient change of position to constitute the reliance essential to a fraud claim. TheBraswell holding is important in its recognition that a plaintiff's accepting an underpayment from a defendant exercising exclusive control over the process of falsely performing the measurements and calculations for the underpayment, constitutes a change of position sufficient to satisfy the reliance element of a fraud claim.
A less restricted rule is recognized by Reis v. Peabody CoalCo., 997 S.W.2d 49 (Mo.Ct.App. 1999). That court observes:
 "other courts `have consistently held that the reliance element of actionable fraud is satisfied when a plaintiff accepts payments in reliance upon representations which intentionally understate the amount due.'"
997 S.W.2d at 66-67 (quoting Johns Hopkins Hosp. v. Peabody CoalCo., 920 F.Supp. 738, 742 (W.D.Ky. 1996) (citing Braswell v.ConAgra, supra; Morrill v. Becton, Dickinson Co.,747 F.2d 1217, 1223-24 (8th Cir. 1984); L.C.L. Theatres, Inc. v. ColumbiaPictures Indus., 421 F.Supp. 1090, 1100 (N.D.Tex. 1976), aff'd in relevant part, 566 F.2d 494 (5th Cir. 1978))). See Gregory v.Chemical Waste Mgmt., 38 F.Supp.2d 598, 606, 611 (W.D.Tenn. 1996) (although each side verified "the accuracy of royalty calculations and payment throughout the term of the agreement" by "appoint[ing] a representative to calculate the facility's revenues and the quarterly installments or royalty payment," the plaintiffs justifiably relied on the "quarterly statements that falsely represented that the royalty payments were calculated on 12 1/2% of `disposal' revenues which term both parties understood and intended to include all revenues exclusive of transportation revenues according to the terms of the purchase agreement"), andMetro-Goldwin-Mayer, Inc. v. Antioch Theatre Co.,52 Ill.App.3d 122, 133, 367 N.E.2d 247, 256, 9 Ill.Dec. 813, 822 (1977) ("Defendants knowingly and repeatedly reported untrue grosses to plaintiffs. . . . The distributors had to accept these figures as true to calculate their income from the license agreements. Defendants realized this and continued their deception.").
As the main opinion acknowledges, James Griggs, State Lands Director for the Department of Conservation and Natural Resources, testified:
 "[w]hen we received these reports that we assumed the reports were accurate. We deposited the funds. We allowed [Hunt] to use the gas that they had reported they produced. We allowed them to sell the gas.
 "We took those funds and we made what we know now to be an erroneous assumption that they were correct and we made projections for budgets. The [S]tate of Alabama always — as everyone knows, we make annual projections on revenues coming into the [S]tate. So we relied on those as being correct reports and we — we made every assumption that they were correct."
This testimony, of course, supports a reasonable inference that Griggs's agency did in fact read the reports, since reading them would be necessary to making assumptions and budget projections on the basis of the reports.
Griggs further testified that, when he learned that lessees Shell and Amoco (not parties to the case now before us) were taking deductions not allowed by their leases and were thereby underpaying the royalties they owed the State, he prompted them to pay the remaining sums due. Similarly, as soon as Griggs's agency notified Hunt that its royalty payments would be audited, Hunt paid $249,000 toward its own underpayments; and, some months after the agency delivered the completed *Page 26 
audit to Hunt, it paid $317,806.73 more toward its own balance of underpayments. However, Hunt refused to pay the balance of the underpayments and interest demanded by the State (Defendant's exhibits # 82, 84, 85, 86, 90, 91, 94). Because Hunt refused to pay the lion's share of the underpayments and interest, the State could hardly increase its budget projections, as the main opinion suggests would have been necessary for the budget projections to constitute reliance. Only after the trial court, on November 13, 2000, granted summary judgment in favor of the State on one of its breach-of-contract claims and this Court, on December 27, 2000, denied Hunt permission to appeal the partial summary judgment did Hunt pay the balance of the underpayments and interest demanded by the State. This evidence supports a reasonable inference that, had the State sooner known the truth about the volumes and the "gross proceeds" from the lease to Hunt, the State sooner would have obtained part payment and then full payment from Hunt.
The acceptance by the State of the underpayments from Hunt, the action by the State in making budget projections, and the inaction by the State in allowing Hunt to use and to sell the gas and in not sooner requiring Hunt to pay the underpayments, constitute a change of position legally sufficient to fulfill the reliance element of this fraud action. Braswell, Gregory, Earle,McMillan Niemeyer, Shades Ridge Holding Co., Johnson, Holeman, and Reis, supra.
While Hunt argues that it did report to the Alabama Department of Revenue, though not to the Department of Conservation and Natural Resources, the "gross proceeds" as defined by the definition proved by the State in this case, the record contains undisputed evidence that the Alabama Department of Revenue could not reveal this information to any other State agency. Thus the evidence of the reports to the Alabama Department of Revenue does not impair the applicability of Braswell, supra, or otherwise diminish the legal sufficiency of the proof of reliance by the State.
While the State did plan to audit, and indeed eventually proceeded to audit, the volumes of and deductions for the gas produced by Hunt, that plan and those eventual audits do not equate to a lack of reliance by the State. Commonly, a measure of trust and reliance between parties to a contract is a practical necessity even though eventual verification, by audit or other means, may be a requirement of due diligence or a standard practice for such a contract. The legal mandate that parties perform their contracts in good faith, see Peninsular Life Ins.Co. v. Blackmon, 476 So.2d 87, 89 (Ala. 1985), bespeaks each party's right to rely upon the other's performance, including performance in the form of representations required by contract. The case of Smith v. J.H. Berry Realty Co., 528 So.2d 314 (Ala. 1988), cited and quoted by the main opinion, is distinguishable and thus inapt. The plaintiff's alleged reliance in J.H. BerryRealty Co. postdated his own extensive personal investigation into the matters represented, while the reliance by the State in the case now before us preceded the audit of the royalty payments from Hunt.
Because the State sufficiently proved reliance, Hunt was not due a judgment as a matter of law on the ground of the insufficiency of the evidence to prove the reliance element. Thus, I respectfully submit that this Court should not ground a reversal of the judgment for the State on a holding that the trial court erred in denying Hunt a judgment as a matter of law. *Page 27